[Cite as *State v. Williams*, 2020-Ohio-269.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                    :

    Plaintiff-Appellee,              :

                                          No. 108275

    v.                                           :

FRANKLYN WILLIAMS,                               :

    Defendant-Appellant.             :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 30, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-15-593764-A, CR-15-593844-A, CR-15-593998-A, and
CR-15-594806-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Eben McNair and Carson Strang, Assistant Prosecuting Attorneys, *for appellee.*

Dale M. Hartman, *for appellant.*

LARRY A. JONES, SR., J.:

{¶ 1} Defendant-appellant, Franklyn Williams ("Williams"), appeals his conviction and sentence on multiple charges. Finding no merit to the appeal, we affirm.

{¶ 2} In 2015, Williams was indicted in four separate cases. In Cuyahoga C.P. No. CR-15-593764-A, he was charged with aggravated robbery, robbery, kidnapping, and having weapons while under disability, all with one- and three-year firearm specifications. The aggravated robbery, robbery, and kidnapping charges each contained notices of prior conviction and repeat violent offender specifications.

{¶ 3} In Cuyahoga C.P. No. CR-15-593844-A, Williams was charged with aggravated robbery, robbery, kidnapping, two counts of theft, and misuse of a credit card. The aggravated robbery, robbery, and kidnapping charges contained one- and three-year firearm specifications, notices of prior conviction, and repeat violent offender specifications.

{¶ 4} In Cuyahoga C.P. No. CR-15-593998-A, Williams was charged with aggravated robbery, two counts of theft, misuse of credit cards, and having weapons while under disability. The aggravated robbery charge contained one- and three-year firearm specifications, notice of prior conviction and repeat violent offender specifications, and one theft charge contained one- and three-year firearm specifications.

{¶ 5} In Cuyahoga C.P. No. CR-15-594806-A, Williams was charged with failure to comply and drug possession.

{¶ 6} The four cases were consolidated and initially proceeded to a jury trial in January 2016. On the second day of trial, Williams entered into a plea agreement with the state. Under the terms of the plea agreement, Williams and the state agreed

to a sentence of 14 years in prison and the trial court imposed the agreed upon sentence.

{¶ 7} Williams appealed, claiming that his plea was not knowingly, voluntarily, and intelligently made, he had received ineffective assistance of counsel, and the trial court erred in failing to hold a hearing on his motion to withdraw his guilty pleas. *State v. Williams*, 8th Dist. Cuyahoga Nos. 104078 and 104849, 2017-Ohio-2650, ¶ 1. This court found that the trial court did not substantially comply with its duty to inform Williams of "the maximum penalty involved" under Crim.R. 11 because Williams received inaccurate information about judicial release during his plea hearing. *Id.* at ¶ 22. This court concluded that but for the erroneous information Williams would not have entered the guilty plea, reversed his conviction and sentence, and remanded the case. *Id.* at ¶ 22, 25.

{¶ 8} The record reflects that after the case was remanded the state offered Williams the same plea and agreed sentence of 14 years. Williams rejected the state's offer. Upon Williams's motion, the trial court recused itself and the case was transferred to another trial judge. The matter proceeded to a second jury trial in December 2017; the notices of prior conviction, repeat violent offender specifications, and having weapons while under disability counts were tried to the bench.

**December 2017 Trial**

**Smiley robbery**

{¶ 9}   78-year old W. Smiley ("Smiley") testified that on December 8, 2014, he was getting out of his car at his doctor's office, located in Euclid.  Smiley testified that a car pulled up next to him and blocked his way.  A man, later identified as Williams, got out of his car and asked Smiley if he had change for a five dollar bill.  Smiley said he did not.  The man was holding a gun, told Smiley to give him his wallet, and took Smiley's wallet and cell phone.

{¶ 10} Williams attempted to use Smiley's credit card to purchase liquor at two stores the same day.  The owner of Collinwood Liquor Store testified that he was working the cash register when a man entered the store wearing a black jacket and black pants and tried to buy a couple bottles of liquor, but the man could not get the debit feature of the credit card he was using to work.  The owner viewed a photo array and identified Williams with "80 percent" certainty.

{¶ 11} The owner of the Marathon gas station located on East 152nd Street in Cleveland testified that a man wearing a vest and dark pants that had white stripes running down the side walked from a light-colored Lexus SUV towards the store.  The owner authenticated a receipt from the store, which showed a purchase for $24.90 made with Smiley's credit card.  A still shot of the surveillance footage entered into evidence showed Williams wearing a green shirt, black hat, puffy vest, and dark pants with white stripes running down the side.

{¶ 12} Euclid Police Detective Michael Caruso ("Detective Caruso") investigated the robbery. After Williams was arrested in February 2015, Detective Caruso interviewed Williams, who admitted to being involved in the Smiley robbery. Williams downplayed his involvement, claiming that someone else held up Smiley. According to Williams, he was the driver and used Smiley's credit card to "get gas."

{¶ 13} During trial, Smiley, who had been subpoenaed to testify, was sitting in the courthouse lobby with his daughter. Smiley and his daughter testified that Williams approached them in the lobby, introduced himself, put out his hand to shake Smiley's hand, and said to Smiley, "I'm sorry I did this." Smiley's daughter told Williams they should not talk to him and Williams walked away.

**Watkins robbery**

{¶ 14} A week after the Smiley robbery, on December 14, 2014, D. Watkins ("Watkins") was leaving Loganberry Apartments in Richmond Heights when a man pointed a .38 caliber revolver at him and robbed him of his wallet, cellphone, and keys. Watkins called 911 and told dispatchers that the man who robbed him was driving a "cream-colored Lexus SUV," wearing a "black beanie" and had a "mustache that turned into a beard." The 911 call was made at approximately 1:43 a.m.

{¶ 15} Detective Charles Duffy ("Detective Duffy") of the Richmond Heights Police Department investigated the robbery. He viewed surveillance video from the Marathon gas station on East 152nd Street in Cleveland. The video showed a man, later identified as Williams, walking into the store at 2:00 a.m., less than 20 minutes

after Watkins called 911, wearing a black hat, dark vest, and dark pants with white stripes running down the side. Williams used Watkins's credit card at the store.

{¶ 16} Detective Duffy compiled a photo array that included Williams. Another officer in the department showed it to Watkins. Watkins made a selection from the photo array and, according to Detective Duffy, the department was able to proceed in its investigation based on Watkins's selection.

{¶ 17} Watkins did not appear to testify at the December 2017 trial. Watkins's mother testified that her son did not want to testify, and she did not know his whereabouts.

{¶ 18} Yolanda Jackson ("Jackson") testified that she was dating Williams in December 2014. At that time, Jackson owned an off-white Lexus SUV. She testified that Williams had access to the vehicle and drove it in December 2014. The only other person who drove the car was an aunt. Detective Duffy interviewed Jackson and her daughter, both of whom identified Williams from the December 14th surveillance footage at the Marathon gas station.

**Wooten robbery**

{¶ 19} The next day, December 15, 2014, local business owner D. Wooten ("Wooten") was on his way to the bank when he stopped at the Convenient Food Mart on Babbitt Road in Euclid. As Wooten exited the store to return to his vehicle, a man got out of a light-colored Lexus SUV and pointed a .38 caliber gun at him. The man demanded, "You know what this is, give it up!" Wooten handed over a rubber-banded roll of cash, which consisted of thousands of dollars of cash.

{¶ 20} After the robbery, Wooten viewed surveillance footage from inside of the convenience store and positively identified a man in the store wearing a black hat and puffy vest as the man who had robbed him. Wooten was "100 percent" sure about his identification. Wooten subsequently viewed a photo array at the police department and was "80 percent" sure about his identification.

{¶ 21} An eyewitness to the robbery, M. Williams, was outside of the store when she heard a commotion and saw Wooten, whom she knew because she worked for him, with his hands in the air. She saw a man standing in front of Wooten wearing a "skull cap" and puffy vest. M. Williams saw the man get into a light-colored Lexus SUV and drive away. She noted a partial license plate number and gave the number to police.

{¶ 22} About a week later, Wooten saw the same Lexus outside of one of the bars he owned and realized that Williams's girlfriend "frequented" his establishment. Wooten called police, who later confirmed that the SUV belonged to Williams's girlfriend, Jackson.

{¶ 23} The owner of the Convenient Food Mart testified to the authenticity of the video footage from his store. In the video footage, which was entered into evidence and played for the jury, Williams can be seen standing in line behind Wooten and wearing a dark puffy vest, black hat, and dark pants with white stripes running down the sides.

{¶ 24} When Detective Caruso interviewed Williams about the robbery, Williams told the detective, "I don't know why he [Wooten] called you [the police]

because I didn't get anything." Williams insisted that he was with another man whom he initially thought took the money, but later thought Wooten recovered his money because neither he nor the man he was with ended up with the rubber-banded roll of money.

{¶ 25} Williams also admitted to the detective that he used to have a black .38 caliber revolver but claimed that he no longer possessed it and did not know what happened to the handgun.

**Failure to comply**

{¶ 26} Lieutenant Neil Laughlin ("Lieutenant Laughlin") of the Ohio State Highway Patrol testified that on February 15, 2015, he was patrolling a local Cleveland street. Lieutenant Laughlin observed a Dodge Charger make a signal violation. The officer initiated a traffic stop and the suspect car pulled over. When Lieutenant Laughlin got out of his cruiser to approach the vehicle, the car sped off.

{¶ 27} The lieutenant testified that the following occurred:

I reentered my cruiser and a lengthy vehicle pursuit took place. During the course of that pursuit, there was a multitude of traffic violations committed, approximately 30 stop signs were run, 13 to 20 red lights were run, passed multiple vehicles. Top speed was around 90 miles an hour.

At the end of the pursuit, the driver decided to jump out of the driver's door while the vehicle was still moving, so the vehicle drifted off into a yard. I pursued the driver on foot.

{¶ 28} The officer eventually caught the driver, who happened to be wearing a black puffy vest and black athletic pants with three white stripes running down the

side. The police seized marijuana and codeine pills and identified the driver as Williams. The officer arrested Williams on multiple warrants.

{¶ 29} Lieutenant Laughlin identified Williams in court. The lieutenant's dash cam video was played in court for the jury and entered into evidence.

**Williams cuts off his ankle monitor while on home detention**

{¶ 30} Williams was out on bond for the few months leading up to his December 2017 trial. As a condition of his bond, Williams was on home detention and wore an ankle monitor. In between the first and second day of witness testimony, Williams cut off his ankle monitor. He did not appear for the remainder of his trial.

{¶ 31} Alonda Garth, a probation officer in the pretrial GPS electronic monitoring unit, testified that Williams cut off his ankle monitor on December 15, 2017, and his whereabouts were unknown. Cuyahoga County Sheriff's Deputy Anthony McGowan ("Deputy McGowan") testified that he received an alert on December 15, 2017, that Williams had tampered with his ankle monitor. Deputy McGowan attempted to locate Williams but was unable to find him. The deputy recovered the cut ankle monitor strap inside of a tire in a Cleveland field.

{¶ 32} The trial continued in Williams's absence.

**Jury Verdict**

{¶ 33} In Case No. CR-15-593764-A, the "Smiley robbery," the jury convicted Williams of all counts and specifications. In Case No. CR-15-593844-A, the "Watkins robbery," the jury acquitted Williams of aggravated robbery and convicted

him of all other counts and specifications. In Case No. CR-15-593998-A, the "Wooten robbery," the jury convicted Williams of all counts and specifications. In Case No. CR-15-594806-A, Williams was convicted of misdemeanor failure to comply and acquitted of the drug charge. The court convicted Williams of all counts and specifications tried to the bench in each case.

{¶ 34} Because Williams's whereabouts were unknown at the time of the verdict, the court continued the case for sentencing.

**Sentencing**

{¶ 35} In July 2018, Williams was arrested in Nebraska and extradited to Ohio. He appeared, with counsel, for sentencing. The trial court attempted to sentence Williams to a total of 24 years in prison, but later determined that the sentence was not final and the sentence was never journalized. The trial court referred Williams for a presentence investigation report and competency evaluation. On the same day, the court recused itself from the case and requested the Ohio Supreme Court to assign a visiting judge to the case "to conduct the sentencing hearing and to handle any other further proceedings according to law."[1] The case was reassigned to a visiting judge.

{¶ 36} The newly assigned trial court entered an entry in September 2018 noting that the parties had stipulated to the findings of the court psychiatric clinic that Williams "refused or was unable to cooperate with the evaluation," so the clinic

---

[1]The case garnered national attention after the trial court ordered the courtroom deputies to place duct tape over Williams's mouth due to Williams's repeated outbursts during his July 2018 hearing.

was unable to render an opinion as to his competency. The court ordered Williams to an inpatient facility for a competency evaluation.

{¶ 37} At a hearing held in November 2018, the parties stipulated to the findings of the competency report, which found that Williams was competent and able to assist in his defense.

{¶ 38} During this time period, Williams filed numerous pro se motions including motions for new trial, motions to have the trial court recuse itself, motions for new attorneys, notices to the previous trial court asking it to intervene in the case, motions regarding Williams's mail, and various other unclassifiable motions.

{¶ 39} In February 2019, the trial court held a sentencing hearing after which it issued a lengthy sentencing journal entry. The court sentenced Williams to a total sentence of 33 years in prison as follows: Case No. CR-15-593764-A, 11 years to run consecutive to all other cases; Case No. CR-15-593844-A, 10 years to run consecutive to all other cases; Case No. CR-15-593998-A, 12 years to run consecutive to all other cases; Case No. CR-15-594806-A, six months in jail to run concurrent to all other cases.

{¶ 40} Williams filed a notice of appeal. Since filing a notice of appeal, Williams has made numerous attempts to discharge his appointed appellate counsel and is currently on his third appellate counsel. When Williams again tried to discharge appointed appellate counsel, this court issued an order stating that it would not allow appellate counsel to withdraw but that Williams could represent himself if he so chose. Williams did not file any notice with this court that he was

proceeding pro se; therefore, this court will proceed on the assignments of error that appellate counsel filed on his behalf.

## Assignments of Error

I. The trial court erred in failing to dismiss the case for failure to bring defendant to trial within the statutory or constitutional speedy trial time.

II. Defendant's sentence was vindictive in violation of law.

III. The trial court erred in failing to grant the Crim.R. 29 motion for acquittal.

IV. The jury verdict was against the sufficiency of the evidence.

V. The court erred in granting the joinder for trial and allowing prior acts.

VI. The verdict was against the manifest weight of the evidence.

## Law and Analysis

### No Violation of Speedy Trial Rights

{¶ 41} In the first assignment of error, Williams claims that the trial court erred in denying his motion to dismiss based on denial of his speedy trial rights.

{¶ 42} In August 2017, after this court overturned Williams's conviction and his case was remanded to the trial court, Williams filed a motion to dismiss his case based on a violation of his speedy trial rights. Williams argued that his statutory speedy trial rights had been violated. The state objected. The trial court held a hearing and denied Williams's motion, finding that his right to a speedy trial had not been violated.

{¶ 43} In October 2017, through new counsel, Williams filed another motion, this time arguing that his constitutional right to a speedy trial was violated. Again the state objected. The court held a hearing and determined that Williams's speedy trial rights had not been violated.

{¶ 44} A criminal defendant has a right to a speedy trial under the Ohio Revised Code (statutory speedy trial rights), and the Ohio Constitution and the Fifth and Sixth Amendments to the United States Constitution (constitutional speedy trial rights).

{¶ 45} The Ohio Revised Code requires that a person against whom a felony charge is pending shall be brought to trial within 270 days after the person's arrest. R.C. 2945.71(C)(2). Speedy-trial provisions are mandatory and courts must strictly enforce them. *State v. Parker*, 113 Ohio St.3d 207, 2007-Ohio-1534, 863 N.E.2d 1032, ¶ 15. The trial court must discharge the defendant upon a timely motion if the defendant is not brought to trial in the allotted time. R.C. 2945.73(B).

{¶ 46} There are exceptions, however. In *State v. Hull*, 110 Ohio St.3d 183, 2006-Ohio-4252, 852 N.E.2d 706, the Ohio Supreme Court held:

> R.C. 2945.71 does not apply to criminal convictions that have been overturned on appeal. The time limit for bringing a person charged with a crime to trial whose conviction has been overturned on appeal is governed by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

*Id.* at ¶ 26.

{¶ 47} Pursuant to *Hull*, R.C. 2945.71 does not apply to this case because Williams's convictions were overturned on appeal. Thus, our concern herein is whether the court violated Williams's constitutional right to a speedy trial.

{¶ 48} To determine whether a defendant has been deprived of his or her constitutional speedy trial rights, a court must balance four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's timely assertion of his or her rights, and (4) and prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

{¶ 49} Before a court engages in a balancing test under *Barker*, the court must make a threshold determination concerning the length of delay. "'Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'" *Hull* at ¶ 23, quoting *Barker* at *id.* Thus, length of delay serves as a triggering mechanism for the rest of the *Barker* analysis. *Barker* at *id.*

{¶ 50} A delay becomes presumptively prejudicial as it approaches one year in length. *Doggett v. United States*, 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), fn. 1. The crux of Williams's constitutional argument is that the length of delay in his case was over two years between his initial arrest and the filing of his motion to dismiss. But a review of the lengthy record in this case shows that the second factor, the reason for the delay in this case, weighs heavily in favor for the state. Almost all of the continuances in the case have been at Williams's request or as a result of Williams's actions, including: ongoing discovery; numerous motions

for new attorneys; appointment of new counsel; motions for the court to recuse itself; the first trial judge recusing herself at Williams's request; defense motions including motions to suppress, motions to dismiss, and motions to modify bond conditions; and countless pro se filings.

{¶ 51} Williams was represented by at least seven different attorneys during the pendency of these proceedings and has filed multiple appeals, including two pro se appeals. Although Williams claims he asserted his speedy trial rights early, he did not file his first motion until August 2017 (he filed a second motion in October 2017). Moreover, two different trial courts gave Williams full and impartial hearings on his motions.

{¶ 52} Finally, with regard to the fourth factor, we find no prejudice. The delay of the proceedings was primarily caused by Williams's own actions. Thus, we find no constitutional violation of Williams's speedy trial rights.

{¶ 53} Accordingly, the first assignment of error is overruled.

**No Evidence of Vindictive Sentence**

{¶ 54} In the second assignment of error, Williams contends that his sentence was vindictive in violation of law.

{¶ 55} A sentence that is vindictively imposed on a defendant because he or she exercised a constitutional right is contrary to law. *State v. Rahab*, 150 Ohio St.3d 152, 2017-Ohio-1401, 80 N.E.3d 431, ¶ 8. When reviewing a sentence for vindictiveness, we begin by presuming that the trial court considered the proper sentencing criteria. *Id.* at ¶ 19. We then review the record for evidence of actual

vindictiveness. *Id.* "We will reverse the sentence only if we clearly and convincingly find the sentence is contrary to law because it was imposed as a result of actual vindictiveness on the part of the trial court." *Id.,* citing R.C. 2953.08(G)(2) and *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1.

**{¶ 56}** In the case at bar, we do not believe that the record clearly and convincingly shows that the trial court based its sentence on actual vindictiveness.

**{¶ 57}** Williams was originally sentenced to 14 years in prison as part of a plea agreement with the state of Ohio. His conviction and sentence were reversed. *Williams*, 8th Dist. Cuyahoga Nos. 104078 and 104849, 2017-Ohio-2650.

**{¶ 58}** Williams contends that the trial court gave no reason why it increased his sentence from 14 years to 33 years; therefore, his sentence was vindictive and should be reversed. To support his argument, Williams cites *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). Williams claims that the United States Supreme Court held that it is a violation of due process to increase a sentence upon remand because it impermissibly prevents a defendant's exercise of the right to appeal. We disagree with Williams's analysis of the court's holding in *Pearce*.

**{¶ 59}** The *Pearce* court was concerned that a due process violation may occur if a court increased a defendant's sentence on remand without giving justification for the increase. The *Pearce* court held, in part, that "[t]here is no absolute constitutional bar to imposing a more severe sentence on reconviction" and "the reasons for imposition after retrial of a more severe sentence must affirmatively

appear in the record and must be based on objective information concerning the defendant's identifiable conduct after the original sentencing proceeding." *Id.* at syllabus.

{¶ 60} We further note that *Pearce* was overruled in part in *Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). The *Smith* court held that when a greater penalty is imposed after trial than was imposed after a prior guilty plea, the increase in sentence is not likely attributable to the vindictiveness on the part of the sentencing judge. *Id.* at 803. The court noted that even when the same judge imposes both sentences, the relevant sentencing information available to the judge after the plea will usually be considerably less than that available after a trial. *Id.* at 801.

{¶ 61} In the case at bar, Williams's original 14-year sentence was imposed as a jointly recommended sentence after a guilty plea. A second trial judge oversaw a lengthy jury trial during which Williams cut off his ankle monitor after the first day of testimony and did not appear for the remainder of trial. Yet a third trial judge imposed the 33-year sentence. Williams fails to present any evidence that the increase is attributable to vindictiveness on the part of the sentencing judge.

{¶ 62} Contrary to Williams's contention that the sentencing trial court did not provide any reasons for the increase in his sentence, the sentencing court issued a comprehensive journal entry outlining the sentence. In the journal entry, the court stated that it had reviewed the 1057 page transcript, verdict forms, all relevant journal entries, sentencing memorandums, and pertinent case law. The court

further noted that it reviewed supplemental materials not available to the trial court that originally sentenced Williams, which included:

> (1) a pre-sentence investigation and victim impact statements ordered after the original sentencing date; (2) a detailed list of disciplinary infractions committed in prison by the Defendant between 2008 until July 7, 2017 that demonstrated a history of disobeying orders even while incarcerated in prison; (3) the Defendant's lengthy prior criminal record (2004 through 2014), including prior convictions for offenses of violence, and at least four (4) prison sentences; (4) a competency report completed on October 29, 2018 opining that the Defendant is competent, not mentally ill or disabled, although he had some underlying "personality pathology" that may cause him "to intentionally or inappropriately act out toward others."

Sentencing journal entry (March 28, 2019).

{¶ 63} Before imposing sentence, the court expressly considered Williams's history of criminal convictions, failure to follow rules in prison, lack of remorse for current crimes, the fact he was on postrelease control at the time he committed his current offenses, he committed the current offenses as part of a pattern of criminal activity, and he caused psychological harm to his victims.

{¶ 64} Finally, we note that the sentencing judge was the third judge to preside over the case and was not the same judge who imposed Williams's original 14-year sentence.

{¶ 65} In light of the above, the second assignment of error is overruled.

**Sufficient Evidence to Support Convictions**

{¶ 66} In the third and fourth assignments of error, Williams claims there was insufficient evidence to support his convictions.[2]

{¶ 67} Crim.R. 29(A) provides for an acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." A sufficiency challenge essentially argues that the evidence presented was inadequate to support the jury verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins* at *id.*, citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). When reviewing a sufficiency of the evidence claim, we review the evidence in a light most favorable to the prosecution. *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996).

{¶ 68} Williams claims that there was insufficient evidence to link him to the Smiley robbery because the victim gave inconsistent statements regarding the description of the vehicle and whether Williams's complexion was "medium" or "dark." We note that these alleged inconsistencies in victim testimony go to the

---

[2]Williams does not challenge his failure to comply conviction; therefore, we summarily affirm that conviction.

weight of the evidence.  Thus, we will discuss any inconsistencies under the sixth assignment of error.

{¶ 69} There was sufficient evidence to support Williams's convictions with regard to the Smiley robbery.  Smiley testified that "either a van or utility vehicle" pulled up and blocked his way so that he could not get out of his car.  A man, later identified as Williams, asked Smiley if he had change, pointed a gun at him, and demanded Smiley's wallet.

{¶ 70} Williams then used or attempted to use Smiley's credit card at two stores.  The owners of those stores both testified that the man who used Smiley's card wore a black hat, puffy vest, and dark pants with white stripes running down the side.  Williams was captured on surveillance video at both stores.  When Detective Caruso interviewed Williams, Williams admitted to being involved in the robbery, but told Detective Caruso that another man was the actual gunman:

> Williams:  I was driving * * * He hopped out on that man, he ran up on that man. * * * He gave me that [credit] card, I put gas in that car.

{¶ 71} During trial, Williams approached Smiley in the courthouse lobby, introduced himself, and apologized, saying, "I'm sorry I did this."

{¶ 72} There was also sufficient evidence to support his convictions with regard to the Watkins robbery.  Watkins was leaving his apartment in Richmond Heights when a man pointed a .38 caliber gun at him and took his cell phone, keys, and wallet.  Watkins told police the man who robbed him was wearing a black beanie and drove off in a cream-colored Lexus.  Minutes after Watkins called 911, Williams

tried to use Watkins's credit card at the Marathon gas station on East 152nd Street in Cleveland. Both Watkins's girlfriend, Jackson, who owned the Lexus SUV Williams was driving, and her daughter, identified Williams from the December 14th surveillance video.

{¶ 73} We also find that there was sufficient evidence to support his convictions with regard to the Wooten robbery. Wooten identified Williams, who can be seen on surveillance video just before the robbery, standing behind Williams in the food mart and wearing the same puffy vest and black pants with white stripes as he wore during the other robberies and that he was wearing when he was arrested. Moreover, Williams admitted to Detective Caruso that he was involved in the robbery and took a large sum of money from Wooten:

> Why would he [Wooten] come to you all? * * * And if you really look at the cameras you want to know something? I ain't get a dollar. Because it was wrapped in a rubber band and it dropped on the ground. And when I rolled off, I ain't get a dollar. The dude that I was with in the car I beat his a**, I made him strip naked because I thought he stole it. And he ain't got s***. * * * That's what I'm trying to understand like why you going to the police if I ain't even get nothing. * * * The money was in the rubber band. The money fell when I pulled off.

{¶ 74} In light of the above, we find that there was sufficient evidence to support Williams's convictions.

{¶ 75} The third and fourth assignments of error are overruled.

**Joinder of Offenses for Trial**

{¶ 76} In the fifth assignment of error, Williams contends that the trial court erred in joining each of his offenses for trial.

{¶ 77} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

{¶ 78} The law favors joining multiple offenses in a single trial if the requirements of Crim.R. 8(A) are satisfied. *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990); *State v. Ferrell*, 8th Dist. Cuyahoga No. 100659, 2014-Ohio-4377, ¶ 38. If it appears, however, that the defendant would be prejudiced by the joinder, a trial court may grant a severance. Crim.R. 14; *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 95. The defendant bears the burden of proving prejudice and that the trial court abused its discretion in denying severance. *Diar* at *id.*

{¶ 79} The state can refute a defendant's claim of prejudice by joinder of multiple offenses in two ways: (1) a showing that the evidence of each crime is simple and direct or (2) evidence of the other crimes would be admissible even if the counts were severed. *State v. Anderson*, 2017-Ohio-931, 86 N.E.3d 870, ¶ 25 (8th Dist.), citing *Lott* at *id.* When the evidence is "simple and direct," an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of the crimes as other acts under Evid.R. 404(B). *Lott* at *id.* Thus, if the state can meet the

requirements of the "joinder test," it need not meet the requirements of the stricter "other acts test." *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 66, citing *State v. Franklin*, 62 Ohio St.3d 118, 122, 580 N.E.2d 1 (1991).

{¶ 80} "Simple and direct" evidence means that the evidence of each crime is "so clearly separate and distinct as to prevent the jury from considering evidence of [some crimes] as corroborative of the other." *State v. Belle*, 8th Dist. Cuyahoga Nos. 107046 and 107300, 2019-Ohio-787, ¶ 25, citing *State v. Quinones*, 11th Dist. Lake No. 2003-L-015, 2005-Ohio-6576, ¶ 48. Evidence is "simple and direct" if the trier of fact is capable of segregating the proof required for each offense. *Belle* at *id.*, citing *State v. Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379, 937 N.E.2d 136, ¶ 39 (10th Dist.).

{¶ 81} The object of the "simple and direct" test is to prevent the jury from improperly considering evidence of various crimes as corroborative of each other. *State v. Echols*, 128 Ohio App.3d 677, 694, 716 N.E.2d 728 (1st Dist.1998). "The very essence of the rule is that the evidence be such that the jury is unlikely to be confused by it or misuse it." *Id.* Thus, as this court has stated, "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof." *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 16, citing *State v. Lewis*, 6th Dist. Lucas Nos. L-09-1224 and L-09-1225, 2010-Ohio-4202, ¶ 33.

{¶ 82} After a thorough review of the record, we find nothing in the record to suggest that a prejudicial joinder occurred. The charges brought against Williams stemmed from separate incidents relating to different victims. Each case was entirely distinct in proof, involving evidence of separate witnesses and independent police investigation. In addition, the acquittal of some charges — aggravated robbery in Case No. CR-15-593998-A (the Watkins robbery) and possession of drugs in CR-15-594806-A — shows the jury was able to differentiate the cases. Finally, each robbery occurred close in time and each robbery was similar in nature; therefore, it is likely that evidence of the three robberies would be admissible even if the counts were severed.

{¶ 83} Accordingly, we find the record supports trial court's determination that the offenses should be tried together.

{¶ 84} The fifth assignment of error is overruled.

**Verdicts are not against the Manifest Weight of the Evidence**

{¶ 85} In the sixth assignment of error, Williams claims that his convictions are against the manifest weight of the evidence.

{¶ 86} The criminal manifest weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id.* Although there may be legally sufficient evidence to

support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 723 N.E.2d 1054 (2000).

{¶ 87} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.* Reversal on manifest weight grounds is reserved for the "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at *id.*

{¶ 88} Williams contends that Smiley was not a credible witness because he gave inconsistent statements by telling police that the man who robbed him drove a "van" and had a "medium" complexion. We disagree.

{¶ 89} Smiley described the car his assailant was driving as "either a van or utility vehicle." As noted, Williams was driving Jackson's Lexus sport utility vehicle. Smiley also told the police that his assailant had a "medium" complexion, but testified that Williams had a "dark" complexion. As far as any inconsistency with regard to how one might perceive Williams's complexion, medium versus dark, Williams's attorney questioned Smiley about any inconsistency during cross-examination. The jury was free to assess Smiley's credibility on this point. In addition, we find Smiley's testimony, on the whole, credible.

{¶ 90} With regard to the Wooten and Watkins's robberies, Williams restates the same arguments he made under the third and fourth assignments of

error. Upon review, this is not an exceptional case in which the evidence weighs heavily against the convictions.

{¶ 91} The verdicts are not against the manifest weight of the evidence; accordingly, the sixth assignment of error is overruled.

{¶ 92} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

SEAN C. GALLAGHER, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR