[Cite as *State v. Hadley*, 2025-Ohio-2682.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                         :

    Plaintiff-Appellee,         :

                            No. 114578

    v.                                           :

JERROLD HADLEY, JR.,              :

    Defendant-Appellant.     :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 31, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-692547-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carla Neuhauser, Assistant Prosecuting Attorney, *for appellee.*

Robert A. Dixon, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant Jerrold Hadley, Jr. ("Hadley") appeals his conviction for disrupting public services. He raises the following assignment of error for review:

The verdict and judgment finding [Hadley] guilty of disrupting public service in violation of R.C. 2909.04(A)(3) was against the manifest weight of the evidence[.]

{¶ 2} For the reasons set forth below, we affirm Hadley's conviction.

## I. Facts and Procedural History

{¶ 3} In June 2024, Hadley was charged in a seven-count indictment. Count 1 charged him with aggravated burglary. Count 2 charged him with burglary. Count 3 charged him with abduction of S.B., Hadley's minor child. Count 4 charged him with disrupting public services. Count 5 charged him with domestic violence. Count 6 charged him with assault. Count 7 charged him with endangering children. The matter proceeded to a jury trial where the following evidence was adduced.

{¶ 4} E.B. testified that S.B., who was three years old at the time of the incident, is the daughter she shares with Hadley. E.B. has three other children who live with her along with her boyfriend, J.P., who is the father of E.B.'s youngest two children. According to E.B., she and Hadley had a "mostly 50/50" visitation schedule from the time S.B. was born and "kept it kind of 50/50 for a while." (Tr. 245.) E.B. testified that the schedule was never consistent and she wanted a more structured schedule. E.B. further testified that, prior to March 28, 2024, "[i]t had been a while" since Hadley last spent time with S.B. (Tr. 257.)

{¶ 5} E.B testified that on the morning of March 28, 2024, at approximately 5:00 a.m., she was in the kitchen at the back of her house, on Denison Avenue in Cleveland, when she heard a knock at the door. Believing it was her cousin, she went to the door. As she opened the door, she realized it was Hadley. She immediately

tried to close the door and told Hadley "to get off of [her] porch," but he wedged his foot in the door and pushed it open to prevent her from closing it. (Tr. 261.) According to E.B., "the first words that came out of [Hadley's] mouth [were], Give me my daughter." (Tr. 261.) E.B. replied, "It was 5:00 in the morning. [S.B.] was sleeping. That's not how we do parent pick-up drop-off, that's not how we do it at all." (Tr. 261.) E.B. struggled to close the door because Hadley was stronger than her. When she realized that she could not push him out, she started "scream[ing] at the top of [her] lungs for [J.P.]." (Tr. 262.)

{¶ 6} This commotion awoke J.P., who came to E.B.'s assistance. When E.B. moved to allow J.P. to grab the door, "the door flung open," and she observed Hadley "go like at [J.P.], like . . . a tackle move." (Tr. 262.) A physical struggle then ensued on the floor in the front hallway between Hadley and J.P. At the same time, E.B. called 911. E.B. testified that when Hadley realized that she was calling the police, he grabbed the phone from her and threw it out of the apartment. E.B. stated, "As soon as [the police] answered I was telling them my address. And when [Hadley] noticed he took my phone and threw it out . . . into the street[.] . . . [L]ike he literally seen that I was on the phone with the police. I just been on the phone for only a couple seconds. He snatched my phone, you know . . . and chucked it out [the front door]." (Tr. 264.) E.B. further testified that she did manage to call the police, she "just can't remember . . . how [she] was able to get on the phone with the police." (Tr. 270.)

**{¶ 7}** Hadley was able to get past J.P. and went into the bedroom to get S.B. E.B. testified that, at first, he grabbed the wrong child. When he realized this, he returned this child, found S.B., and took her outside to his car. E.B. followed them outside. While outside, E.B. observed Hadley's mother, Darsheria Tukes ("Tukes"), arrive. Tukes spoke with Hadley, put S.B. into her car, and then Hadley left the scene. When the police arrived they spoke with Tukes, E.B., and J.P. The police then returned S.B. to E.B. According to E.B., Hadley texted her approximately an hour and a half later stating, "Your phone in the grass over there. I never took it. I threw it over there." (Tr. 276.)

**{¶ 8}** J.P. testified that he awoke to E.B. screaming for him. When he came into the front room, he observed E.B. struggling at the door trying to prevent Hadley from forcing his way into their house. J.P. then moved E.B. out of the way and tried to close the door himself. According to J.P., Hadley forced his way in and they both fell into the doorway and onto the ground. They both then scrambled to stand up. J.P. observed Hadley reach for the bedroom door so he tried to take Hadley's hand off the doorknob. J.P. then started to choke Hadley. J.P. "put [his] arm over [Hadley's] shoulder, kind of wrapped it around [Hadley's] neck and was trying to force him back out the front door, which was right next to [J.P.'s] bedroom door." (Tr. 314.) After approximately three minutes of this struggle, J.P. testified that he was able push Hadley "back out [his] screen door onto the porch, and when we got back on the porch [J.P.] let [Hadley] go." (Tr. 314-315.) Once J.P. let Hadley go, Hadley "brushed" his way back into the house and grabbed S.B. from the bedroom.

(Tr. 315.) J.P. testified that after Hadley took S.B., he called 911 from his cell phone. The 911 calls were played for the jury. In the calls, E.B. and J.P. can be heard telling the 911 operator that Hadley came into their home and took S.B.

{¶ 9} Following the close of the State's case, the court dismissed Counts 3 and 5 (burglary and domestic violence) pursuant to Hadley's Crim.R. 29 motion.

{¶ 10} Tukes and Hadley testified for the defense. Tukes testified that on the morning of March 28, she was on her way home. As she pulling into the parking lot, she came across Hadley who told her that he had a dream about S.B. and wanted to "see if she [was] okay before [he went] to work." (Tr. 362.) She replied that "[she will] meet [him] there." (Tr. 362.)

{¶ 11} Tukes testified that when she arrived at E.B.'s house, E.B. "was outside screaming, I should kill you, with a knife in her hand, screaming. She had something, she was screaming. And [J.P.] was on the other end of the porch screaming, and [Hadley] was outside and he had [S.B.]" (Tr. 363.) Tukes then told Hadley, "Give me [S.B.] . . . . And you leave, I'll stay here for the police to come. And I was like, when the police come we'll go from there." (Tr. 364.) According to Tukes, she walked over to the porch and asked E.B. if she wanted S.B. E.B. replied, "[S]he didn't want [S.B.]. [E.B.] said she wanted to wait for the police." (Tr. 366.) In response, Tukes "told her it was cold outside" and that she was "going to sit in the car" with S.B. (Tr. 366.) Tukes testified that when the officer approached her, she told him that Hadley was going to work and advised the officer of Hadley's work location.

{¶ 12} Hadley testified that on the day in question he had a dream about S.B. and wanted to check on her welfare. According to Hadley, E.B. opened the door after he knocked on it and he told her that he wanted "to make sure [S.B.]'s okay." (Tr. 387.) At that point, Hadley "already had [his] foot at the door because [he was] assuming [E.B. was] not going to bring [S.B.] outside, it's 4 or 5:00 in the morning." (Tr. 387.) E.B. then closed the door on Hadley's foot and told him that he needed to leave. Hadley testified that as he called out for S.B., E.B. began to choke him. Thereafter, J.P. came to the door, choked Hadley, and a physical altercation ensued between the two of them. Hadley further testified that he remembered when E.B. tried to call the police. Hadley stated, "At that point in time I . . . took the phone and I . . . threw it in the grass because it was no reason as far as for the police to come." (Tr. 390.) Hadley explained that he threw the phone in fear of his own safety as the victim of assault and felt there was no need to involve the police. According to Hadley, he had no intention of leaving with S.B. that day; he just wanted to make sure she was "okay." (Tr. 390.) Hadley gave S.B. to Tukes and left because Tukes told him to and he had to go to work.

{¶ 13} After the conclusion of trial, the jury found Hadley not guilty of all remaining counts except Count 4 (disrupting public services). The trial court sentenced Hadley the same day to "time served," waived costs and fines, and ordered Hadley be released. (Journal entry, Oct. 23, 2024.)

{¶ 14} It is from this order that Hadley now appeals.

## II. Law and Analysis

{¶ 15} In his sole assignment of error, Hadley contends that the jury's verdict was against the manifest weight of the evidence. Hadley was convicted of disrupting public services, a fourth-degree felony, in violation of R.C. 2909.04(A)(3), which provides that "[n]o person, purposely by any means or knowingly by damaging or tampering with any property, shall . . . substantially impair the ability of law enforcement officers, firefighters, rescue personnel, emergency medical services personnel, or emergency facility personnel to respond to an emergency or to protect and preserve any person or property from serious physical harm."

{¶ 16} Hadley argues that it "is unknown which *mens rea* standard that the jury employed in this case between purposely and knowingly." (Emphasis in original.) (Hadley's brief, p. 6.) Hadley contends the jury lost its way in convicting him under either mens rea because he did not subjectively perceive either that there was an "emergency" or that the police were needed to avoid serious physical harm. In making this contention, Hadley challenges the sufficiency of the evidence, stating that the State failed to present evidence of the requisite mens rea to commit the offense and even if this court should determine that there were sufficient facts to sustain the verdict, "at best those facts amounted only to an attempt." (Hadley's brief, p. 7.) These arguments, however, are inappropriate under a manifest-weight challenge and will not be addressed.

{¶ 17} Rather, "a manifest weight challenge questions whether the prosecution has met its burden of persuasion." *State v. Bowden*, 2009-Ohio-3598,

¶ 13 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). When reviewing a manifest-weight challenge, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 2022-Ohio-1397, ¶ 54 (8th Dist.), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 18} As this court has previously stated:

> The criminal manifest weight of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id*. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).
>
> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id*., quoting *Thompkins* at *id*.

*State v. Williams*, 2020-Ohio-269, ¶ 86-87 (8th Dist.). Thus, our focus is to determine whether the prosecution has met its burden of persuasion and whether

this is the exceptional case in which the evidence weighs heavily against the conviction.

{¶ 19} Hadley's argument regarding the manifest weight of the evidence — that the jury lost its way in convicting him under either mens rea because he did not subjectively perceive either that there was an emergency or that the police were needed to avoid serious physical harm — is unpersuasive.

{¶ 20} After reviewing the record, we find that the prosecution has met its burden of persuasion and this is not the exceptional case in which the evidence weighs heavily against the conviction. The jury, as the factfinder, heard E.B.'s testimony that when Hadley realized she was calling the police, he grabbed the phone from her and threw it out of the apartment. The jury also heard Hadley's own testimony admitting that he took E.B.'s phone from her and threw it in the grass to prevent her from calling for assistance. Moreover, he concedes, in his appellate brief, that he took the phone intending to prevent the police from responding to the scene. His actions delayed the response of police arriving to the scene and allowed him to leave before the police arrived. We cannot say that the jury lost its way.

{¶ 21} Therefore, the sole assignment of error is overruled.

{¶ 22} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's

conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN T. GALLAGHER, P.J., and
ANITA LASTER MAYS, J., CONCUR