[Cite as *In re T.N.R.*, 2023-Ohio-85.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE T.N.R. | : | |
| | : | No. 111367 |
| A Minor Child | : | |
| | : | |
| [Appeal by T.N.R., Minor Child] | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 12, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-21-107970

### *Appearances:*

Susan J. Moran, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jacob Williams, Assistant Prosecuting Attorney, *for appellee.*

MARY J. BOYLE, J.:

{¶ 1} Appellant-T.N.R. challenges her juvenile adjudications for aggravated robbery, robbery, kidnapping, and felonious assault. T.N.R. argues that there is insufficient evidence to sustain her adjudications and that her adjudications are against the manifest weight of the evidence. She further argues that she was

denied effective assistance of counsel when defense counsel did not move to suppress her videotaped statement to the police. Finding that the filing of a motion to suppress would not have changed the outcome of trial and that there is sufficient evidence to sustain her adjudications, we affirm.

## I. Facts and Procedural History

{¶ 2} In September 2021, T.N.R. (d.o.b. 09/06/03) was charged in a ten-count complaint in the Cuyahoga County Court of Common Pleas, Juvenile Division, for acts, which if committed by an adult, would constitute felonies ranging from the first degree to the fifth degree. Count 1 charged her with aggravated robbery. Counts 2-4 charged her with robbery. Count 5 charged her with kidnapping. Count 6 charged her with felonious assault. Count 7 charged her with theft. Count 8 charged her with unauthorized use of property. Count 9 charged her with telecommunications fraud.[1] Count 10 charged her with improperly handling a firearm in a motor vehicle.

{¶ 3} T.N.R., who was 17 years old at the time of the incident, was charged under a complicity theory for the conduct of her boyfriend, Michael Hardiman ("Hardiman"), for the aggravated robbery of Cobra Sparks ("Sparks"), who was selling T.N.R. marijuana. The matter proceeded to trial, at which the following evidence was adduced.

---

[1] Each of Counts 1-9 carried both a one- and three-year firearm specification.

{¶ 4} Sparks testified that on August 21, 2021, he received a call from a younger female he did not know asking to meet at an apartment complex parking lot in Cleveland Heights, Ohio to smoke marijuana. Once Sparks arrived, he called the female and waited for her. Five to ten minutes later, a female got into the front passenger's side of his car. Five seconds later, a male, later identified as Hardiman, came up to the passenger's side door. The female then exited the car, and Hardiman got into the car. Hardiman struck Sparks in the face, cutting his cheek and leaving a scar. Sparks did not observe what Hardiman hit him with but did testify that Hardiman was carrying a gun in his hands. He later testified that he did not think that Hardiman had a weapon but rather "something pretending to be a weapon." (Jan. 18, 2022, tr. 24.)

{¶ 5} Hardiman then told Sparks to "give him the money," reaching into Sparks's pockets and taking some cash. (Jan. 18, 2022, tr. 23.) Sparks stated that Hardiman grabbed some cash out of his pocket but most of the money fell back into his car. Hardiman also took his cell phone. Sparks testified that Hardiman left after he took the money. He then testified that he did not think that Hardiman actually got any of his money and that they drove his car for about ten feet and then Hardiman exited the car. Sparks then volunteered, "I don't even really know where the kidnapping come in at because he got out." (Jan. 18, 2022, tr. 24.)

{¶ 6} When questioned about the ten-foot distance, Sparks further testified saying that he "went in reverse and — and drive. That's it. About two to five feet. Like really not nowhere. So that's when I reversed and went into drive about, yeah,

about five feet and he hopped out." (Jan. 18, 2022, tr. 25.) When asked by the appellee, the state of Ohio ("state"), if he wanted to get out of the car at that time, Sparks replied no because he is paralyzed and in a wheelchair. (Jan. 18, 2022, tr. 25-26.) After Hardiman exited the car, Sparks then drove from the scene and waited in another parking lot, "recuperating" from the incident for ten to fifteen minutes. (Jan. 18, 2022, tr. 27.) He then went home. At home, Sparks called the woman he thought he was meeting and accused her of setting him up. Sparks then decided to drive back to the same apartment complex to look around and report the incident to the police.

{¶ 7} On cross-examination, Sparks testified that he could not identify the female who got into his car and that he did not speak to her as she was only in the car eight to ten seconds. Defense counsel questioned Sparks about his phone and the Cash App. Sparks testified that he gave Hardiman his Cash App handle while they were in the car and that money was transferred from his account to an unknown female's account.

{¶ 8} Cleveland Heights Police Detective Michael Mathis ("Det. Mathis") testified that he investigated the case. As part of his investigation, he was able to create a photo lineup from the apartment complex surveillance footage. From that lineup, Sparks identified Wynzo Brown ("Brown") as a party involved in the robbery. The police determined that Brown was not involved in the robbery, but in an interview with Det. Mathis, Brown was able identify Hardiman and his nephew from the photographs. Before law enforcement put out an arrest warrant for Hardiman,

Brown's sister, Tanya Gatson ("Gatson"), brought Hardiman and T.N.R. to the police station for an interview on September 9, 2021. Det. Mathis further testified that T.N.R was arrested after the interview.

{¶ 9} Following her arrest, T.N.R. had an asthma episode that necessitated treatment while being processed in the Cleveland Heights jail, and she was taken to MetroHealth Hospital. Det. Mathis and Det. Robinson ("Det. Robinson") followed T.N.R. to the hospital and interviewed her while she was in a hospital bed. The interview was recorded and played for the court. The video depicts Det. Mathis and Det. Robinson in T.N.R.'s hospital room while she is receiving a breathing treatment for her asthma attack.

{¶ 10} T.N.R. did not have a parent or guardian present during the questioning. She had turned 18 years old three days prior to the interview. The video first depicts T.N.R. being read her *Miranda* rights and then signing a waiver. T.N.R. initially denied any involvement with Sparks or the Cash App. She then stated that she bought marijuana that she did not like and that Hardiman wanted to get his money back. The detectives continued to question T.N.R. She told the detectives that she did not call Sparks and told them to look at her phone records.[2] The detectives told T.N.R. that she needed to tell them what happened or she could end up in prison. They told T.N.R. that the charges were serious and gave her a notepad to write down what happened. The detectives told T.N.R. that if she told

---

[2] Det. Mathis testified that the police never performed a phone dump on T.N.R.'s phone even though it was sent to the forensic science lab.

them what happened, she would get out of jail in the morning. The detectives told T.N.R. that they would help her out by planning for her to go to juvenile detention instead of county jail because she was 17 years old at the time of the incident. T.N.R. said she would tell the truth as long as Hardiman did not find out.

{¶ 11} In the video, Det. Mathis can be heard telling T.N.R. if she did not call Sparks, then he wanted to eliminate her from the crime. At this point, T.N.R. can be observed telling the detectives that she was with Hardiman when they pulled into a gas station. Hardiman exited his vehicle to talk with some females. T.N.R. did not hear what was said because she was still in the vehicle. The group then drove to another house where they planned the robbery, but she was not part of the conversation. The group then drove to the apartment complex where the females from the gas station were already parked. T.N.R. then stated that Hardiman told her to go into Sparks's car and tell him she wanted marijuana. She stated that when she got into the car, Sparks started flirting with her. Then, suddenly, Hardiman pulled her out of the car, and T.N.R. walked away and got into another car. Hardiman drove around with Sparks, and T.N.R. did not know where he went. When Hardiman returned, he had a car seat cover that he threw away, and the two of them went inside an apartment in the complex. T.N.R. did not know how much money Hardiman had, but he split it with the females and Raymond Brown ("Raymond"). Hardiman gave her two packets of marijuana later. T.N.R. observed Raymond hand Hardiman a gun at the time of the incident that Hardiman returned to Raymond afterwards.

{¶ 12} The detectives told T.N.R. that her statement helped her immensely and they wanted to clear her. The detectives also stated that she got caught in circumstances in which she was with her boyfriend when he did something stupid. During the interview, T.N.R. can be observed receiving medical treatment, at which point the interview stopped. After the conclusion of the video, Det. Mathis made an in-court identification of T.N.R. (Jan. 18, 2022, tr. 56.)

{¶ 13} On cross-examination, Det. Mathis testified that law enforcement believed that T.N.R. set up the incident. He further testified that Sparks's cell phone records indicated that he did not receive a call or text from T.N.R.'s phone number, which confirmed what she told the detectives at the hospital. Det. Mathis further testified that T.N.R.'s Cash App account was not used to receive any money from Sparks's Cash App account. T.N.R. told Det. Mathis that she is scared of Hardiman and Raymond and that she would tell him the truth as long as they did not find out.

{¶ 14} Det. Mathis further testified that Sparks is "a known weed seller in that area. * * * Everybody knows the guy in the wheelchair is the one that sells the weed." (Jan. 18, 2022, tr. 68.) With regard to Gatson, Det. Mathis testified that she is Jewel's daughter and Raymond's mother. The group was at Jewel's apartment. Gatson called law enforcement and set up this interview with T.N.R. and Hardiman. Det. Mathis testified that he believed Gatson coordinated the interview to protect Raymond.

{¶ 15} On redirect examination, Det. Mathis testified that he believed T.N.R. was more afraid of Raymond and Gatson than Hardiman. He further testified that

Sparks was only cooperative on the first day of the investigation. After that, law enforcement did not hear from Sparks again until the day of trial.

{¶ 16} At the conclusion of the state's evidence, defense counsel moved for dismissal of all charges under Crim.R. 29. The trial court granted the motion with respect to the one- and three-year firearm specifications in each of Counts 1-6 and 8-9, and Counts 7 and 10 were dismissed in their entirety.

{¶ 17} After the conclusion of trial, the juvenile court determined that the state did not prove beyond a reasonable doubt the charges in Counts 8 and 9 and dismissed those charges. With regard to Counts 1-6, the court adjudicated T.N.R. delinquent under a theory of complicity, stating that T.N.R.'s

> conduct before [the incident] is that you are part of this group. You're with them.
>
> Your conduct after is that you are part of this group, you're with them.
>
> The complicity rule was created to protect innocent bystanders, those who have no connection to the crime other than being merely present.
>
> You were more than just merely present. And for that reason, the Court finds that the State of Ohio has been able to establish beyond — proof beyond a reasonable doubt of each and every element with respect to the aggravated robbery.
>
> Count 1, as it pertains to [T.N.R.], she'll be adjudicated delinquent of that on a complicity argument.
>
> She'll be adjudicated delinquent, as well, on Counts 2, 3, and 4. Those are the robberies, felonies of the second degree, Counts 2 and 3. And then Count 4, the robbery, felony of the third degree.
>
> She is complicit on Count 5, the kidnapping, and Count 6, the felonious assault.

(Jan. 18, 2022, tr. 106-107.)

{¶ 18} The matter was then referred to the Ohio Department of Youth Services ("ODYS") for review. At the dispositional hearing on March 8, 2022, the court acknowledged the ODYS recommendation for probation with a suspended commitment and T.N.R.'s history with juvenile court, noting an escalation in her behavior. The court ordered T.N.R. committed to one year at ODYS, up to her 21st birthday on Count 1 (aggravated robbery). The court ordered that the sentences on the remaining counts merge with the aggravated robbery. The court also ordered

[A] $1,500 fine on the aggravated robbery. That fine will be suspended.

* * *

The fine on the kidnapping, again, is 1,500; on the felonious assault, that is 1,000.

* * *

All those fines are suspended.

She's given credit of 47 days.

(Mar. 8, 2022, tr. 16-17.)

{¶ 19} It is from this order that T.N.R. appeals, raising the following three assignments of error for review, which shall be discussed out of order where appropriate.

**Assignment of Error One:** The trial court erred by denying [T.N.R.'s] motion for acquittal pursuant to Ohio Crim.R. 29 when the state failed to submit sufficient evidence of [T.N.R.'s] complicity.

**Assignment of Error Two:** [T.N.R.'s] convictions are against the manifest weight of the evidence.

**Assignment of Error Three:** [T.N.R.] was denied effective assistance of counsel and due process as guaranteed by the Fifth, Sixth,

and Fourteenth Amendments of the Ohio and United States' Constitutions.

## II. Law and Analysis

### A. Effective Assistance of Counsel and the Motion to Suppress

{¶ 20} We first address T.N.R.'s ineffective assistance claim. T.N.R. argues defense counsel was ineffective for failing to file a motion to suppress her videotaped statement to police. She contends that she provided her statement to the police only after she was assured that she would not be prosecuted. She further contends that without her statement to the police, the state would only have had Sparks's testimony, which does not establish any complicity between T.N.R. and Hardiman, and would have changed the outcome of the case.

### 1. Standard of Review

{¶ 21} To establish ineffective assistance of counsel, T.N.R. must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive her of a fair trial. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), citing *Strickland* at 697.

{¶ 22} With regard to a motion to suppress, the Ohio Supreme Court has held that the "'[f]ailure to file a suppression motion does not constitute per se

ineffective assistance of counsel.'" *Madrigal* at 389, quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Rather, the appellant must demonstrate that the motion would have "had a reasonable probability of success" and affected the outcome of the case. *State v. Patterson*, 2017-Ohio-8318, 99 N.E.3d 970, ¶ 35 (8th Dist.), citing *State v. Sanchez*, 8th Dist. Cuyahoga No. 103078, 2016-Ohio-3167; *State v. Moon*, 8th Dist. Cuyahoga No. 101972, 2015-Ohio-1550; *State v. Kirk*, 8th Dist. Cuyahoga Nos. 95260 and 95261, 2011-Ohio-1687, ¶ 46 ("Failure to file a motion to suppress constitutes ineffective assistance of counsel only if, based upon the record, the motion would have been granted."). "'Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met [their] burden of proving that [their] attorney violated an essential duty by failing to file the motion.'" *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 208, quoting *State v. Gibson*, 69 Ohio App.2d 91, 95, 430 N.E.2d 954 (8th Dist.1980). Even when there is some evidence in the record to support a motion to suppress, "'an appellate court presumes that defense counsel was effective if defense counsel could reasonably have decided that the motion to suppress would have been futile.'" *State v. Leiter*, 12th Dist. Warren No. CA2016-12-104, 2017-Ohio-8537, ¶ 37, quoting *State v. Dominguez*, 12th Dist. Preble No. CA2011-09-010, 2012-Ohio-4542, ¶ 20; *see also State v. Edwards*, 8th Dist. Cuyahoga No. 69077, 1996 Ohio App. LEXIS 3033, 4-5 (July 11, 1996), citing *State v. Martin*, 20 Ohio App.3d 172, 485 N.E. 717 (1st Dist.1983).

## 2. T.N.R.'s Videotaped Statement to the Police

{¶ 23} We begin our analysis by addressing whether T.N.R. would have been successful on a motion to suppress her videotaped statement to the police. T.N.R. does not dispute that she was read her *Miranda* rights. Rather, she argues that the only reason she provided a statement to the police was because she believed that she would not be charged with the conduct of Hardiman. She believed she was receiving a guarantee from the police that she would not get in any trouble as long as she told the truth. T.N.R. contends that it was only after the police effectively promised not to prosecute her that she agreed to provide a truthful statement. As a result, she argues that her videotaped statement to the police was involuntary and the juvenile court would have granted a motion to suppress if one was argued.

{¶ 24} We note that "[w]hen a suspect is questioned in a custodial setting, the Fifth Amendment requires that [the suspect] receive *Miranda* warnings to protect against compelled self-incrimination." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 34, citing *Miranda v. Arizona*, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, "[a] suspect may then knowingly and intelligently waive these rights and agree to make a statement. [*Miranda*] at 479. If a defendant later challenges a confession as involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence." *Id.*, citing *Miranda* at 475; *Colorado v. Connelly*, 479 U.S. 157, 168-169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶ 25} To determine whether a valid waiver occurred, courts should "'consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *Id.* at ¶ 35, quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, and citing *Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The Ohio Supreme Court has held that a waiver is voluntary "*unless* there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep." (Emphasis sic.) *Id.*, citing *State v. Cooey*, 46 Ohio St.3d 20, 28, 544 N.E.2d 895 (1989).

{¶ 26} The Ohio Supreme Court has found that coercion may exist "when law-enforcement officers 'persuad[e] or deceiv[e] the accused, with false promises or information, into relinquishing his rights and responding to questions.'" *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 111, quoting *Edwards* at 39. The presence of promises, however, "'does not as a matter of law, render a confession involuntary.'" *Id.*, quoting *Edwards* at 41. Indeed, "[o]fficers may discuss the advantages of telling the truth, advise suspects that cooperation will be considered, or even suggest that a court may be lenient with a truthful defendant." *Id.*, citing *Edwards* at 41. And "[a]dmonitions to tell the truth are considered to be neither threats nor promises." *State v. Loza*, 71 Ohio St.3d 61, 67, 641 N.E.2d 1082 (1994), citing *Cooey*; *State v. Wiles*, 59 Ohio St.3d 71, 571 N.E.2d 97 (1991). "Finally,

it is not unduly coercive for a law-enforcement officer to mention potential punishments." *Belton* at ¶ 111, citing *State v. Western*, 2015-Ohio-627, 29 N.E.3d 245, ¶ 38 (2d Dist.); *compare State v. Robinson*, 9th Dist. Summit No. 16766, 1995 Ohio App. LEXIS 145, 4 ("While a correct statement of the law may not render a confession involuntary, a misstatement of the law may cause such a confession to be involuntary.").

{¶ 27} In *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), the Ohio Supreme Court addressed the *Miranda* waiver of a defendant who was questioned in the hospital while receiving medical treatment. The defendant had been shot in the chest by police during the course of a bank robbery. The defendant suffered a severe spinal cord injury and, upon admission to the hospital, was in shock, cold and clammy, and his blood pressure was very low due to blood loss. *Id.* at 230. According to the attending physician, at the time of his admission to the hospital, the defendant could not understand questions. *Id.* Detectives questioned the defendant about his involvement in the bank robbery after his blood pressure had improved. *Id.*

{¶ 28} The Supreme Court upheld the trial court's denial of the defendant's motion to suppress, concluding his *Miranda* waiver was valid. The *Jenkins* Court noted that the detectives obtained the doctor's permission to conduct the interview, which lasted no more than 45 minutes, and that the defendant was conscious throughout. The defendant was able to converse in a normal voice and indicated he understood his rights and expressed a willingness to talk to the police. The

detectives ceased their interrogation when the defendant indicated that he no longer wished to speak with them. *Id.* at 232-233.

{¶ 29} Other courts have addressed the issue of a defendant's intoxication and its effect on the *Miranda* waiver. "The presence of drugs and/or alcohol does not render a statement inadmissible per se. Rather, while their presence should be considered, 'the amount must sufficiently impair the confessor's ability to reason.'" *State v. Fairley*, 3d Dist. Hancock No. 5-03-41, 2004-Ohio-2616, ¶ 21, quoting *State v. Stewart*, 75 Ohio App.3d 141, 147, 598 N.E.2d 1275 (11th Dist.1991).

{¶ 30} In *Fairley*, the Third District Court of Appeals held that the defendant validly waived his *Miranda* rights even though the defendant admitted he was drunk and used cocaine earlier in the day, the deputy noted "moderate odor of alcoholic beverage" coming from the defendant, saw a can of beer between his legs, and noticed that his eyes were glassy and blood shot. *Id.* at ¶ 20. The court reached this conclusion because according to the deputy, the defendant "did not appear to have trouble understanding any of his rights, did not act confused, did not have slurred speech, and did not exhibit any other signs of intoxication, such as difficulty standing, maintaining train of thought, and/or finishing sentences." *Id.* Additionally, the deputy stated the defendant "indicated he understood each right read to him by the deputy, that he had no questions concerning these rights, and that he would be willing to waive those rights and talk to the deputy." *Id.*

{¶ 31} Comparison of the hospital settings in *Jenkins* and *Fairley* with the the instant case reveals that indicia of involuntariness and coercion are not present.

Here, T.N.R. appears coherent and stable in the video. She was conscious the entire time and did not slur her speech or appear to be under the influence of any medication or substance. T.N.R. was under arrest at the time but was not in handcuffs. The questioning by Det. Mathis and Det. Robinson lasted approximately 45 minutes. There is nothing to suggest that T.N.R.'s state of mind was altered. T.N.R. was able to write her statement in a notepad. In addition, the officers did not prevent T.N.R. from receiving any medical treatment while questioning her.

{¶ 32} In the video, Det. Mathis can be observed reading T.N.R. her *Miranda* rights and then T.N.R. can be observed signing the waiver. T.N.R. initially denied any involvement with Sparks. The detectives continued to question T.N.R. and told her she needed to tell them what happened or she could end up in prison. They told T.N.R. that the charges were serious and gave her a notepad to write down the events. The detectives also told T.N.R. that if she told them what happened, she would get out of jail in the morning. The detectives told T.N.R. that they would help her out by planning for her to go to juvenile detention instead of county jail because she was 17 years old at the time of the incident. Det. Mathis can be heard telling T.N.R. that if she did not call Sparks, then he wanted to eliminate her from the crime. At this point, T.N.R. told the detectives what happened and implicated herself in the crime. Following her statement, the detectives told T.N.R. that her statement helped her immensely and they wanted to clear her.

{¶ 33} The officers neither made promises nor coerced T.N.R. The officers stated that they wanted to help clear T.N.R.'s name and that there is a difference

between going along with a crime and actually setting it up. The officers encouraged T.N.R. to tell the truth and said they would talk to the prosecutor. The Ohio Supreme Court has found that officers may suggest that a court may be lenient with a truthful defendant and it is not unduly coercive for a law-enforcement officer to mention potential punishments. *Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 111, citing *Edwards*, 49 Ohio St.2d at 41, 358 N.E.2d 1051; *Western* at ¶ 38. Furthermore, "[a]dmonitions to tell the truth are considered to be neither threats nor promises." *Loza*, 71 Ohio St.3d at 67, 641 N.E.2d 1082; citing *Cooey*, 46 Ohio St.3d at 28, 544 N.E.2d 895; *Wiles*, 59 Ohio St.3d at 81, 571 N.E.2d 97, 112.[3]

{¶ 34} Therefore, based on the foregoing facts and circumstances, we decline to find that T.N.R.'s statement was involuntary or coerced based on the totality of the circumstances and the foregoing case law. We cannot say that a motion to suppress T.N.R.'s statement would have been successful. "'[A]n appellate court presumes that defense counsel was effective if defense counsel could reasonably have decided that the motion to suppress would have been futile.'" *Leiter*, 12th Dist. Warren No. CA2016-12-104, 2017-Ohio-8537 at ¶ 37, quoting *Dominguez*, 12th Dist. Preble No. CA2011-09-010, 2012-Ohio-4542 at ¶ 20. Accordingly, defense counsel was not ineffective.

{¶ 35} Therefore, the third assignment of error is overruled.

---

[3] We do find that the officers' telling T.N.R., who recently turned 18, that she would go to juvenile detention instead of county jail because she was 17 at the time misleading because they should have done that anyways. This statement does not rise to the level of "coercion."

{¶ 36} Having concluded that defense counsel was not ineffective, we now address T.N.R.'s arguments regarding the sufficiency and manifest weight of the evidence.

## B. Sufficiency of the Evidence

{¶ 37} In the first assignment of error, T.N.R. argues that the state failed to submit sufficient evidence of her complicity to aggravated robbery, robbery, felonious assault, and kidnapping adjudications because Sparks could not identify her as the woman in his car at the scene of the crime and she had no knowledge of Hardiman's plans.

{¶ 38} The standard of review for issues involving the sufficiency of the evidence in delinquency adjudications is the same standard for adult criminal defendants: "we view the evidence most favorably to the state to determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *In re D.C.*, 2018-Ohio-163, 104 N.E.3d 121, ¶ 3 (8th Dist.), citing *In re Washington*, 81 Ohio St.3d 337, 339, 691 N.E.2d 285 (1998); *In re J.S.*, 8th Dist. Cuyahoga No. 102800, 2015-Ohio-4990, ¶ 13.

{¶ 39} In *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, the Ohio Supreme Court recently cautioned that

> it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does

not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id.* at ¶ 16.

{¶ 40} Here, T.N.R. was adjudicated delinquent under a theory of complicity as set forth in R.C. 2923.03(A)(2), which provides that "[n]o person, acting with the kind of culpability required for the commission of an offense shall * * * aid or abet another to commit the offense[.]" Under R.C. 2923.03(F), a defendant guilty of complicity "shall be prosecuted and punished as if [the defendant] were a principal offender. A charge of complicity may be stated * * * in terms of the principal offense."

{¶ 41} The Ohio Supreme Court has found that "[t]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, syllabus. The *Johnson* Court explained that the circumstances surrounding the crime include "'presence, companionship[,] and conduct before and after the offense is committed.'" *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). The mere presence,

however, "'of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.'" *Id.* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). The court cautioned that this "rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." *Id.*

{¶ 42} In the instant case, T.N.R. was adjudicated delinquent for having committed acts that, if committed by an adult, would have constituted complicity to aggravated robbery in violation of R.C. 2911.01(A)(1), which provides that no person shall "[h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it" during the commission of a theft offense; robbery in violation of R.C. 2911.02(A)(2), which provides that no person shall "[i]nflict, attempt to inflict, or threaten to physical harm on another" during the commission of a theft offense; robbery in violation of R.C. 2911.02(A)(3), which provides that no person shall "use or threaten the immediate use of force against another"; kidnapping in violation of R.C. 2905.01(A)(2),which provides that no person "shall remove another from the place where the other person is found or restrain the liberty of the other person * * * to facilitate the commission of any felony or flight thereafter"; and felonious assault in violation of R.C. 2903.11(A)(2), which provides that no person shall knowingly "[c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶ 43} T.N.R. argues the state failed to establish that Hardiman possessed a deadly weapon while committing the theft offense and failed to establish that Hardiman inflicted serious physical harm on Sparks. She further argues there was no evidence that Sparks was ever restrained of his liberty or moved from the place where Hardiman first encountered him. We find T.N.R.'s arguments unpersuasive.

{¶ 44} In her interview, T.N.R. stated that she was with Hardiman when they pulled into a gas station and that Hardiman exited his vehicle to talk with some females. The group then drove to another house where they planned the events but she was not part of the conversation. She contacted Sparks to purchase some marijuana. The group then drove to the apartment complex where the females from the gas station were already parked. T.N.R. knew Hardiman had a gun, and she observed Raymond give Hardiman a gun before they met up with Sparks. Hardiman told her to go into Sparks's car and tell him she wanted marijuana. Hardiman pulled her out of Sparks's car and drove around with Sparks. Sparks testified that he was hit in the face, which cut open his cheek and left a scar. Sparks further testified that he was unable to get out of his car because he is paralyzed. When Hardiman returned, he had a car seat cover that he threw away and the two of them went inside an apartment in the complex. Hardiman gave T.N.R. two packets of marijuana, and she observed Hardiman with some cash. She did not know how much money Hardiman had, but he split it with the females and Raymond.

{¶ 45} In adjudicating T.N.R. delinquent, the trial court stated:

[COURT]: [One] way of showing that a person aided or abetted, or essentially was complicit is that what was your participation. Well, it says that participation of criminal intent may be inferred from presence, companionship, conduct before and after the offense is committed.

Your conduct before is that you are part of this group. You're with them.

Your conduct after is that you are part of this group, you're with them.

The complicity rule was created to protect innocent bystanders, those who have no connection to the crime other than being merely present.

You were more than just merely present.

(Jan. 18, 2022, tr. 106-107.)

{¶ 46} We agree with the trial court. T.N.R. was more than just merely present. She was aware of and involved in the theft. She initiated the marijuana sale and knew a gun was involved, cash was taken, and Sparks was assaulted. T.N.R. did not attempt to stop Hardiman from entering Sparks's car, nor did she try to leave. When this evidence is viewed in a light most favorable to the state, we find that state presented sufficient evidence to support the adjudications.

{¶ 47} Therefore, the first assignment of error is overruled.

## C. Manifest Weight of the Evidence

{¶ 48} In the second assignment of error, T.N.R. argues that her adjudications are against the manifest weight of the evidence because there was no competent, credible evidence that she was complicit with Hardiman's independent actions.

{¶ 49} We note that "the same standard of review for manifest weight of the evidence applies to juvenile and adult criminal matters." *In re C.J.R.*, 8th Dist. Cuyahoga No. 102253, 2015-Ohio-3477, ¶ 27, citing *In re G.R.*, 8th Dist. Cuyahoga No. 90391, 2008-Ohio-3982, ¶ 37, citing *In re J.A.S.*, 12th Dist. Warren No. CA2007-04-046, 2007-Ohio-6746. When reviewing a manifest-weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 54, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin* at 175.

{¶ 50} As this court has previously stated:

The criminal manifest-weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest-weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id*. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the

appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86-87.

{¶ 51} To find merit in this assignment of error, we must disbelieve T.N.R.'s statement in which she told the police the events detailing the incident with Sparks. T.N.R. admits to initiating a marijuana sale with Sparks. She stated in the video that she was present when the crimes occurred. She observed Raymond hand Hardiman a gun. She entered Sparks's car to purchase marijuana knowing that her boyfriend, Hardiman, had a gun nearby. T.N.R.'s conduct set up Sparks to be robbed of his money and cellphone. T.N.R. was present during the meetings planning the robbery.

{¶ 52} When the foregoing evidence is weighed, we decline to find the trial court lost its way so as to create a manifest miscarriage of justice that would warrant the adjudications to be reversed. T.N.R. was complicit in the crimes, and thus her adjudications are not against the manifest weight of the evidence.

{¶ 53} Accordingly, the second assignment of error is overruled.

## III. Conclusion

{¶ 54} For the reasons stated above, we find that defense counsel was not ineffective for failing to file a motion to suppress because the filing of the motion would have been futile. We further find sufficient evidence to sustain T.N.R.'s delinquency adjudications and her adjudications are not against the manifest weight of the evidence.

{¶ 55} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

MICHELLE J. SHEEHAN, J., CONCURS;
ANITA LASTER MAYS, A.J., DISSENTS (WITH SEPARATE OPINION ATTACHED)

ANITA LASTER MAYS, A.J., DISSENTING:

{¶ 56} I respectfully dissent from the majority's conclusion and would find that counsel was ineffective when a motion to suppress was not filed because the granting of the motion would have changed the outcome of the case.

{¶ 57} In this case, T.N.R. suffered an asthma attack at the jail. T.N.R. was given medications and treatment at the jail that was never revealed to the court. Once at MetroHealth, the treating physician assistant entered the room after the detective read T.N.R. her *Miranda* rights around three minutes into the video. The physician assistant confirmed that T.N.R. was given medicine on her way over to the emergency room. T.N.R. states that her chest was tight and she was experiencing shortness of breath and requested another treatment. The physician assistant

agrees to give another treatment and at that time, the detectives stated "[W]e need to ask her questions before you start her next treatment." This happens around 5:58 on video one. The doctor exits and the detective jumps up for T.N.R. to sign the waiver. The detectives questioned T.N.R. for an additional 15 minutes before Detective Mathis states "let me get the nurse for her treatment" as if he notices distress in T.N.R.

{¶ 58} The Ohio Supreme Court has determined that during questioning the use of an "inherently coercive tactic" is essential to a finding of involuntariness. Examples of coercive tactics include threats, deprivation of sleep, or medical treatments to name a few. *State v. Cooey*, 46 Ohio St.3d 20, 544 N.E.2d 895, ¶ 28 (1989). When Detective Mathis delayed T.N.R.'s breathing treatment, he engaged in a coercive tactic.

{¶ 59} It has been determined that to prove ineffective assistant of counsel "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). T.N.R. argues that counsel's failure to file the motion to suppress her statement was error. "Failure to file a motion to suppress does not constitute per se ineffective assistance of counsel. Rather, the failure to file a motion to suppress constitutes ineffective assistance of counsel only when the record

demonstrates that the motion would have been successful if made." *State v. Sanchez*, 8th Dist. Cuyahoga No. 103078, 2016-Ohio-3167, ¶ 22.

{¶ 60} The record reveals that T.N.R.'s statements incriminated herself through identification. The victim, Sparks, was unable to identify her. But for her statements, T.N.R. would not have been convicted and therefore was prejudiced by counsel's deficient performance. Vague speculations of prejudice is insufficient proof of ineffective assistance of counsel. *State v. Edmonds*, 7th Dist. Mahoning No. 18 MA 0110, 2020-Ohio-1148, 17, citing *State v. Watkins*, 7th Dist. Jefferson No. 07 JE 54, 2008-Ohio-6634, ¶ 15. The proof presented in this record is specific and, therefore, T.N.R. was prejudiced from counsel's failure to file the motion to suppress.

{¶ 61} For the foregoing reasons, I would reverse T.N.R.'s adjudication of delinquency.