[Cite as *State v. Lorenzana*, 2024-Ohio-2900.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 112768 |
| v. | : | |
| XAVIER LORENZANA, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED; REMANDED
**RELEASED AND JOURNALIZED:** August 1, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-663082-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Brian Callahan, Assistant Prosecuting Attorneys, *for appellee.*

Joseph V. Pagano, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} In this appeal, defendant-appellant, Xavier Lorenzana ("Lorenzana"), contends that he had a reasonable expectation of privacy in his hotel room and the trial court should have suppressed the drugs and money the officers discovered after effectuating his arrest on an active warrant. Following a jury trial, Lorenzana

appeals his convictions and sentence for drug trafficking, drug possession, and possessing criminal tools. For the reasons set forth below, we affirm the trial court's judgment and we find that Lorenzana did not have a reasonable expectation of privacy to the hotel room because Lorenzana had three active warrants for his arrest, the hotel affirmatively acted to evict Lorenzana, the police had knowledge that Lorenzana was evicted, and the police had a reasonable belief that he was in the hotel room. However, because the trial court assessed the mandatory $10,000 fine after finding Lorenzana indigent and waiving the fine, we remand to the trial court for the sole purpose to correct the sentencing entry to reflect that the mandatory $10,000 fine was waived.

## I. Facts and Procedural History

{¶ 2} In September 2021, Lorenzana was charged in a five-count indictment stemming from his arrest at the Radisson Cleveland Airport Hotel in North Olmsted. Count 1 charged him with trafficking a fentanyl-related compound in an amount equaling or exceeding 1,000 unit doses or 100 grams. Count 2 charged him with drug possession of a fentanyl-related compound in an amount equaling or exceeding 1,000 unit doses or 100 grams. Count 3 charged him with drug possession of a substance containing cocaine with the amount of the drug involved being less than 5 grams. Count 4 charged him with drug possession of Tramadol, a Schedule IV drug, in an amount less than the bulk amount. Count 5 charged him with possessing criminal tools and contained a furthermore clause stating that Lorenzana possessed "U.S. currency and/or other drug related materials" with

purpose to commit drug trafficking. Each of the counts carried a forfeiture of money in a drug case clause in the amount of $987.

{¶ 3} Lorenzana filed a motion to suppress, seeking to suppress the evidence seized from his arrest at the Radisson because he had a reasonable expectation of privacy within the room. Plaintiff-appellee, the State of Ohio, opposed and the court held a hearing on the matter. The following evidence was adduced at the hearing.

{¶ 4} Halle Bratz ("Bratz"), the director of sales and a manager at the Radisson, testified that in order to secure a hotel room, a guest must provide a photo ID, a credit card, and complete the hotel registration form. If the guest wanted to extend their stay, the guest would be required to again provide a photo ID, a credit card, and complete the registration form. The hotel would then provide a new key card because the old key card would no longer function properly to unlock the room that was originally rented. If a guest is evicted from a room, it is a normal practice for hotel staff to collect any property that had been left and set it aside so the owner could later retrieve the property. If there is a large amount of property left in the room, the hotel will charge the guest for another night's stay because the hotel needed to clean the room and did not have the opportunity to rent the room to a different guest. This additional fee does not entitle the guest to stay in the room.

{¶ 5} According to Bratz, Lorenzana rented room 615, extending his reservation day-to-day, from August 1-4, 2021. Bratz testified that upon check-in,

their system automatically authorizes payment at the time that the card is swiped at the front desk. She went on to explain, "So that almost time stamps exactly when the guest is present and checking into their room. Sometimes the funds, depending on different bank institutions, will actually remove the funds or show on someone's account a slightly different time or date, but ours is time stamped as to when that card was swiped at the front desk." (Tr. 73.) Bratz testified that a female came to the front desk on either August 3d or 4th to extend the stay for one night. However, the hotel did not renew the reservation at that time because the female refused to provide her identification.

{¶ 6} Bratz further testified Lorenzana was given leniency from August 1st to August 4th, and was allowed to extend his stay in room 615 after the check-out time as a courtesy. The fact that Lorenzana continued to extend his stay on a day-to-day basis, however, without following hotel policy, put a strain on the hotel's operation, and the hotel ultimately decided they would not accept any further extensions of his stay. As a result, Lorenzana was required to checkout on August 5, 2021, by 11:00 a.m. because he did not come to the front desk prior to checkout time to renew his reservation.

{¶ 7} Bratz called the North Olmsted police around 11:00 a.m. on August 5th to assist with the departure. The police advised Bratz that Lorenzana had warrants and they were going to bring multiple units for safety. Bratz and the police walked to room 615, and Bratz knocked on the door. She heard a female voice but could not understand what she said, so she knocked on the door again.

The female then opened the door a few inches, and the police entered the room. Bratz gave the police consent to search the room at that point.

**{¶ 8}** On cross-examination, Bratz acknowledged that an exhibit presented by defense counsel indicates a Cash App transaction for Lorenzana in the amount of $117.50 to the Radisson Hotel on August 5, 2021, at 12:26 p.m. Bratz testified that Lorenzana was charged for this as an additional night and tax following the arrest because they "had to clean up the room. We had to box up everything. We ha[d] to reclean and everything, so we then could not resell that room because it took us away from processing and everything, so we charged them a nominal fee of the past one night's room and tax." (Tr. 96-97.) According to Bratz, this transaction was not reflected in the hotel's records because it "likely was processed on a separate folio . . . because [Lorenzana] was no longer in the guestroom, so we [could not] affiliate that reservation or that charge with a guestroom." (Tr. 97.) Bratz acknowledged that she lacked any records to memorialize what the charge represents for the transaction on August 5th.

**{¶ 9}** North Olmsted Police Officer Jack Butcher ("Officer Butcher") testified that he received a call from Bratz on his cell phone around 10:00 a.m. on August 5th. Bratz indicated to Officer Butcher that the day before a female came to the front desk to "re-up" the room rented in a Lorenzana's name. Bratz did not renew the reservation because the female refused to provide her identification. Officer Butcher ran Lorenzana's name through a law enforcement database, which revealed three active warrants from Lorain. Officer Butcher consulted with

detectives in his office and contacted authorities in Lorain to coordinate a "pick up" of Lorenzana. When Officer Butcher arrived at the Radisson, he met with Bratz, who told him that check out was at 11:00 a.m. and Lorenzana had not "re-upped [his] registration for the next day." (Tr. 120-121.) Bratz requested a civil assist to help them vacate the room. At approximately, 11:30 a.m., Bratz, Officer Butcher, and five other officers went to room 615.

{¶ 10} Officer Butcher testified that as they were walking up to the room, he heard both a female and male voice inside. The officers stood away from the door as Bratz knocked on the door and announced herself. Bratz knocked again, at which point Officer Butcher heard the voices say, "We'll be out shortly." (Tr. 122.) Moments later, a female opened the door. The officers then pushed open the door, pulled the female out, went inside, and cleared the room. Officers found Lorenzana in the bathroom behind the closed door. Officers pulled Lorenzana out of the bathroom and placed him in the hallway where he was detained. Officers then patted Lorenzana down and found a small plastic bag of pills. At this point, Bratz gave the officers consent to search the room. During the subsequent search, Officer Butcher discovered a big bag of pills inside of the toilet tank. Officer Butcher testified that he lifted up the lid "and inside to the left by the flush handle is where th[e]se pills were located." (Tr. 129.)

{¶ 11} Lorenzana testified on his own behalf. On August 1, 2021, he rented a room for himself and a female at the Radisson using his Cash App credit card. He intended to stay day-to-day for a couple of days, and the hotel was "okay with

that." (Tr. 203.) He was able to "re-up" his room each day over the phone, except for August 5th. According to Lorenzana, the hotel attendant asked him to come to the front desk because she had to run his credit card again. As a result, Lorenzana sent the female to the front desk. Upon her return, the female advised that she renewed the room for August 5th. Lorenzana believed that he had paid for the night of August 5th.

{¶ 12} Lorenzana was in the bathroom when he heard the knock on the door. He testified that the police came in with guns pointed at him. The police then put him in handcuffs. Lorenzana asked what this was all about, and the officer advised that they had a warrant for his arrest. The police took Lorenzana to the hallway where they searched him. Lorenzana denied having drugs on his person when he was patted down. He testified that he just had money and a cell phone. He was not in the room when they searched the toilet tank.

{¶ 13} At the conclusion of the hearing, the trial court denied Lorenzana's motion to suppress. The court found that the hotel made the decision to not renew Lorenzana's stay and then contacted the police for a civil assist. The police learned of the active warrants and arrived at the hotel after 11:00 a.m. The court did not believe that the hotel renewed Lorenzana's stay on August 5th, and the last charge by the hotel on August 5th was the penalty assessment. The court laid out its thought process for the record, stating:

> It's after 11:00. He no longer has the expectation [to be able to renew his room after 11:00 a.m.] He is getting arrested, and I do believe that

the hotel at that point in time can give the police the ability to search the room.

Whether or not it's best practices or not, I think if the hotel consents for them to rip out the carpeting, et cetera, they're able to do that[.]

(Tr. 234-235.)

{¶ 14} The matter then proceeded to a jury trial.

{¶ 15} At trial, the State presented the testimony of the same witnesses at the suppression hearing. The trial testimony from these witnesses is relatively consistent to the testimony at the suppression hearing and for the sake of brevity is incorporated herein. Additional relevant evidence that was presented at trial is indicated below.

{¶ 16} Officer Butcher testified Bratz gave him consent to search room 615 and he discovered a bag of pills in the toilet tank. The pills he discovered were not all the same size and were not found in the same location. The police seized $987 in cash, which the defense stipulated to. Officers also found Ziploc bags and separate baggies of pills. Officer Butcher collected two cell phones and gave them to the Lorain police. The female was arrested but not charged.

{¶ 17} North Olmsted Police Detective Manny Roman ("Det. Roman") testified that he was one of the officers at the Radisson when the room was searched. Det. Roman reviewed some of the contents of the phone extraction completed by the Lorain police. He identified three photos from the pictures on Lorenzana's phone. One photo was of blue round pills dated June 25, 2021, at 8:47 p.m. Det. Roman testified that these pills were similar to the M30 pills recovered in the toilet tank on

August 5th. According to Det. Roman, "M30 is a marking on the pill that would stand for oxycodone" and is "laced and pressed with fentanyl and/or heroin, or a combination of both." (Tr. 521.) Another photo was an image of cocaine in plastic wrapping dated June 30, 2021, at 12:24 p.m. The last photo, dated July 22, 2021, at 9:10 p.m., was another image of blue pills and a "zanie bar." (Tr. 521.)

{¶ 18} Det. Roman further testified that in his training and experience, a large amount of pills, like the 940 pills located in the toilet tank, is an indicator of trafficking. Additionally, Det. Roman noted that the recovery of plastic bags or "tie bags" is also an indicator of trafficking. (Tr. 523.) Based on previous controlled buys performed by North Olmsted police department, Det. Roman testified that the pills would probably be worth between $10 and $30 per pill — "almost $10,000 worth[.]" (Tr. 524.) The drugs were sent to the lab for testing, and the lab results revealed that the pills in the toilet tank were fentanyl and the powder was cocaine.

{¶ 19} Edgar Andrus ("Andrus") of the Cuyahoga County Regional Forensic Science Laboratory testified as an expert in drug chemistry. He tested the items submitted and issued a report with his findings. One bag that was submitted to him contained 940 blue pills marked "M30" and was identified as Item 001.01 in his report. As part of his testing, he visually inspects the pills to make sure they were the same shape, color, and size and had the same markings. He then took one tablet at random and tested it in their gas chromatography-mass spectrometry instrument. His testing determined that the blue pill was fentanyl and 4-ANPP. Andrus further testified that the pills were marked "M30," which would mean the

pills contain 30 milligrams of oxycodone hydrochloride. However, Andrus stated that he receives substances with an "M30" marking and about 90-95 percent of the time, these pills do not contain oxycodone.

{¶ 20} Andrus also tested item 001.02, which he determined was 2.26 grams of cocaine hydrochloride; item 002.01, which consisted of a baggie with 15 round blue tablets labeled M30 and was determined to be fentanyl and 4-ANPP; item 002.02, which was 3 round blue tablets marked M30 with one tablet tested as fluorofentanyl, fentanyl, 4-ANPP, and Tramadol; item 002.03, which consisted of blue gray small particles and tested positive for fluorofentanyl, cocaine, fentanyl, 4-ANPP and Tramadol; item 002.04 was one round off-white pill that was marked with a playboy bunny and tested as .48 grams of caffeine. In total, the fentanyl pills recovered weighed 106 grams.

{¶ 21} Andrus explained he would only select one pill from its grouping as a random sample for testing if his visual inspection indicated that they were all of similar color and had the same markings. Andrus then explained hypergeometric testing, which is another form of statistical analysis used for testing large groups of samples. This method of testing requires that he visually inspect the sample to make sure that they appear to be the same and input the number of pills received and then the computer program would indicate how many samples need to be tested to be able to extrapolate results to the entire population.

{¶ 22} When asked on cross-examination what would distinguish ten loose pills from ten small baggies, Andrus replied, "[I]t goes back to that homogenous

population; that they are in the same bag and we are assuming that they came from the same source, whereas if they're packaged separately, they could have been packaged separately at any point in time." (Tr. 580.) With regard to the 940 blue M30 pills, Andrus testified that he only tested one of the tablets because they were all in the same bag. Andrus could say with complete confidence that the remaining 939 pills were that same drug. Whereas, if his testing of that one pill revealed that it did not contain a controlled substance, he would test another pill because he would lack the confidence that the 939 are similarly not a controlled substance. Andrus further testified that there was no statement in his report regarding the confidence level, which is a metric used with hypergeometric testing, that the 940 pills weighed 104.04 grams of fentanyl. As a result, Andrus could not know the degree to which he had confidence that the 940 pills contained 104.04 grams of fentanyl.

{¶ 23} In closing arguments, defense counsel told the jury to find Lorenzana guilty of Counts 3, 4, and 5 because there was "no question" the State met their burden. Defense counsel then urged the jury to find Lorenzana not guilty of Counts 1 and 2 because the State did not meet its burden to establish that there was 104 grams of fentanyl in the bag. The State, in its final close, stated to the jury that because defense counsel conceded guilt on Count 5, the defense implicitly admitted that Lorenzana trafficked drugs under Count 1.

{¶ 24} Following the conclusion of trial, the jury found Lorenzana guilty of all counts and the specifications. In its nunc pro tunc sentencing entry, Counts 1 and 2 merged and the State elected to proceed with sentencing on Count 1 for

which the court imposed a mandatory maximum sentence of 11 to 16.5 years. The

court imposed a 12 month sentence on each of Counts 3 and 5 and ordered them

to be served concurrently with each other and to the 180-day sentence on Count 4.

The court ordered the sentences on Counts 1 and 3 to be served consecutively for a

total sentence of 12 to 17.5 years in prison. Lorenzana was advised of a mandatory

minimum period of 2 years to a maximum of 5 years of postrelease control. The

court awarded 374 days of jail-time credit, assessed costs and fees, and imposed a

mandatory fine $10,000. In the same entry, the court later indicated that it found

Lorenzana indigent and waived the fine.

{¶ 25} Lorenzana now appeals, raising the following six assignments of error

for review:

> **Assignment of Error I:** The trial court erred by denying [Lorenzana's] motion to suppress in violation of the Fourth and Fourteenth Amendment to the United States Constitution and Art. I, § 14 of the Ohio Constitution.
>
> **Assignment of Error II:** [Lorenzana] was deprived of effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Art. I, §10 to the Ohio Constitution.
>
> **Assignment of Error III:** The trial court erred when it denied [Lorenzana's] motion to exclude evidence and for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.
>
> **Assignment of Error IV:** [Lorenzana's] convictions are against the manifest weight of the evidence.
>
> **Assignment of Error V:** [Lorenzana's] constitutional rights were violated when the charges were not dismissed when he was not afforded a speedy trial.

**Assignment of Error VI:** [Lorenzana's] sentence is contrary to law because the record does not support the imposition of consecutives sentences, [Lorenzana] was not provided an opportunity for allocution, the indefinite sentence was not properly imposed, and the waiver of the mandatory fine was not clearly reflected in the sentencing entry.

## II. Law and Analysis

### A. Motion to Suppress

#### 1. Standard of Review

{¶ 26} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357 (1992). On appeal, we "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). Accepting these facts as true, we must then "independently determine as a matter of law, without deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997). "However, we review de novo the application of the law to these facts." *State v. Belton*, 2016-Ohio-1581, ¶ 100, citing *Burnside* at ¶ 8.

#### 2. Entry Into the Hotel Room

{¶ 27} Lorenzana argues that the trial court erred by denying his motion to suppress because he had an expectation of privacy in his room since the Radisson allowed him to extend his stay after the checkout time throughout the entire length

of his stay; he did not abandon his room; and, on August 5, 2021, the hotel took no steps to notify him of its intention not to renew his stay. As a result, he contends his Fourth Amendment rights were violated by the officers' warrantless search of his hotel room.[1]

{¶ 28} In support of his argument, he relies on *State v. Wright*, 2013-Ohio-4473 (8th Dist.), for its proposition that without any affirmative act on the part of the hotel to divest Lorenzana of his status as an occupant, his privacy interest in his hotel room protected him against the officers' warrantless search of his hotel room. In *Wright*, police officers were called to the Airport Plaza Hotel on Brookpark Road. When the officers arrived, they observed Wright, who was naked, sweating profusely foaming at the mouth. Wright knocked off an exit sign and a portion of the in-house sprinkler system and ripped wires down, wrapping them around his neck. Hotel personnel informed the officers that Wright had been pounding on hotel room doors and disturbing other hotel guests. Wright admitted to the police that he had taken PCP. Wright was transported to the hospital where he was treated and ultimately arrested. After Wright was removed from the hotel, hotel staff asked the officers to check his room for damages. An employee of the hotel opened Wright's room and allowed the police inside. The officers did not have a warrant or Wright's permission to enter the room. Wright's room was in disarray, and the police found a bag of

---

[1] The Fourth Amendment protection against warrantless, nonconsensual entry into a suspect's home also extends to hotel rooms. *Hoffa v. United States*, 385 U.S. 293, 301 (1966), citing *United States v. Jeffers*, 342 U.S. 48 (1951) ("A hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office.").

suspected crack cocaine and a vial of suspected PCP in an open drawer in the dresser. Wright filed a motion to suppress all evidence obtained during the warrantless search of his hotel room. *Id.* at ¶ 2-4 The trial court granted Wright's motion, finding that the

> search occurred prior to check-out, Defendant did not voluntarily abandon the hotel room, and the hotel staff did not make any affirmative steps to evict Defendant. Thus, Defendant did not relinquish his expectation of privacy in the hotel room for the duration of his reservation.

*Id.* at ¶ 4.

{¶ 29} The State appealed, arguing that "Wright's disorderly behavior terminated his status as a guest and thereby extinguished any legitimate privacy interest in the hotel room and that the hotel staff properly provided the officers with the consent to search the hotel room." *Id.* at ¶ 8. We found that Wright's privacy interest in his hotel room protected him against the warrantless search of his hotel room by the police officers because there was no evidence of any affirmative acts by the hotel staff to divest Wright of his status as an occupant and guest of the hotel. *Id.* at ¶ 11-12. The staff did not lock Wright out of his room, nor did the hotel staff tell Wright that he was evicted from the hotel or the police officers that they had evicted Wright from his room. *Id.*

{¶ 30} *Wright*, however, is distinguishable from the instant case. In *Wright*, there was no warrant, nor any evidence of any affirmative acts on the part of the hotel staff to divest Wright of his status as the occupant of the hotel room or the police's knowledge that the hotel staff evicted Wright from the room. Whereas, in

the instant case, there is evidence of the hotel's affirmative acts to evict Lorenzana; the police had knowledge that Lorenzana was evicted; Lorenzana had three active warrants for his arrest; and the police had a reasonable belief that he was in the hotel room.

{¶ 31} The fact that Lorenzana had warrants for his arrest and the police had a reasonable belief that he was in the hotel room provided the officers with the authority to enter the hotel room to effectuate an arrest warrant. *State v. Chavez*, 2018-Ohio-4351, ¶ 23 (2d Dist.) (Police may enter a hotel room if they have a reasonable belief that the person named in the arrest warrant is the registered tenant and that the person is present inside the room.); *Payton v. New York*, 445 U.S. 573, 603 (1980) (An arrest warrant based on probable cause provides limited authority to enter the arrestee's dwelling to make an arrest when there is reason to believe the suspect is within.). "Reasonable belief is established by looking at common sense factors and evaluating the totality of the circumstances." (Citations omitted.) *United States v. Pruitt*, 458 F.3d 477, 482 (6th Cir.2006). "[A] reasonable belief is something less than probable cause." *State v. Cooks*, 2017-Ohio-218, ¶ 11 (2d Dist.), citing *Pruitt* at 482-485. "Therefore, police officers do not need probable cause to enter a residence to execute an arrest warrant provided they have a reasonable belief, founded in common sense and based on the totality of the circumstances, that the suspect resides in the home and that he is present at the time." *Id.*, citing *Barrett v. Commonwealth*, 470 S.W.3d 337, 343 (Ky S.Ct.2015).

{¶ 32} Under the totality of the circumstances in this case, the officers had a reasonable belief that Lorenzana, the subject of the arrest warrant, was inside room 615 on August 5th. Bratz, one of the hotel managers at the Radisson, called Officer Butcher and requested assistance with evicting Lorenzana from room 615. Officer Butcher corroborated that Bratz needed assistance with evicting a guest. He ran Lorenzana's name through a database and determined that he had three active arrest warrants. Officer Butcher then contacted the Lorain police department and confirmed they wanted Lorenzana taken into custody for his warrants. Officer Butcher and five other officers arrived at room 615 at approximately 11:32 a.m., which was approximately 30 minutes after the checkout time. The officers heard a male and female voice coming from room 615 prior to their entry. Because the officers had an arrest warrant for Lorenzana and a reasonable belief that he was the tenant present inside of the hotel room, the officers were constitutionally permitted to enter the room to effectuate Lorenzana's arrest. Once Lorenzana was arrested and removed from the room, he no longer had an expectation of privacy in the room. Bratz testified that the Radisson had not renewed Lorenzana's rental of the room. Further, she sought police assistance to evict him. As such, once Lorenzana was arrested and removed from the room, he no longer had an expectation of privacy in the room and Bratz, as the manager of the Radisson, could give consent to the police to search the room.

{¶ 33} Therefore, based on the foregoing, Lorenzana's Fourth Amendment rights were not violated. We find the trial court's conclusions to be supported by

competent, credible evidence and agree that Lorenzana's motion to suppress should have been denied.

{¶ 34} Accordingly, the first assignment of error is overruled.

B. Ineffective Assistance of Counsel

{¶ 35} In the second assignment of error, Lorenzana argues defense counsel was ineffective for (1) failing to object to the admission of photographs from his cell phone (exhibit Nos. 45-48); conceding that Lorenzana was guilty of Counts 3, 4, and 5 because there was "no question" the State met its burden; and (3) failing to subpoena hotel records that would have corroborated Lorenzana's Cash App records establishing that he paid to extend his stay on August 5, 2021.

{¶ 36} To establish ineffective assistance of counsel, Lorenzana must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 687, (1984). The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389, (2000), citing *Strickland* at 697.

1. Cell Phone Pictures

{¶ 37} The State introduced pictures from Lorenzana's cell phone (exhibit Nos. 45-48) through the testimony of Det. Roman. The images are dated June and July 2021 and were described as pictures of blue round pills, cocaine in plastic wrapping, and blue pills and a zanie bar. Lorenzana contends this evidence was

irrelevant and prejudicial and was improperly considered by the jury as proof that Lorenzana was advertising the images for sale. Defense counsel's failure to object to the admission of exhibit Nos. 45-48, however, does not amount to ineffective assistance of counsel. It cannot be said that the admission of these pictures prejudiced Lorenzana so as to deprive him of a fair trial. The jury had other, sufficient evidence to connect him to the drugs in the toilet tank and that he was involved in drug trafficking.

2. Closing Argument

{¶ 38} The State, in its final close, told the jury that because defense counsel conceded guilt on Count 5, the defense admitted Lorenzana was trafficking pursuant to Count 1. Lorenzana contends that there can be no strategic reason for defense counsel to relieve the State of its burden of proof and to invite the jury to convict him of any charges. We disagree.

{¶ 39} In closing arguments, defense counsel stated to the jury, "When I came in here, for opening . . . I said this is not something that we are completely innocent here. That's not my job; to blow smoke and try and fool you or have some sort of deception, and that's not what I'm about." (Tr. 642.) Defense counsel then conceded that the State met its burden in relation to Counts 3-5. With regards to Counts 1 and 2, defense counsel stated that the State did not meet its burden "because there is no way that the government can . . . establish that there was 104-grams of fentanyl[.]"

{¶ 40} The foregoing demonstrates that defense counsel was attempting to gain the jury's credibility with this concession while attacking the drug testing procedure as it pertains to Counts 1 and 2, which are first-degree felonies. While it may not be best practice to concede the lesser counts, in this case, it is clear that defense counsel did so in an attempt to focus the jury on Counts 1 and 2 and establish credibility. It cannot be said that defense counsel's concession in closing argument deprived Lorenzana of a fair trial.

3. Hotel Records

{¶ 41} Lastly, Lorenzana argues that defense counsel's failure to subpoena bank records from the Radisson amounts to ineffective assistance of counsel because there would have been further evidence proving that his August 5th payment extended his stay. According to Lorenzana, if defense counsel had subpoenaed the records, then the court would not have accepted Bratz's self-serving and speculative testimony that the charge must have been a penalty and would have granted his motion to suppress.

{¶ 42} Bratz testified Lorenzana was charged a penalty in the amount of the room fee for August 5th and not as a payment that authorized his stay because he was evicted from a room, the hotel needed to clean the room, and the hotel did not have the opportunity to rent the room to a different tenant. Any bank records that would have been obtained would have shown, just as the Cash App records alleged, that he was charged the exact amount as he was previously charged for one night's stay, which Bratz confirmed was the same amount as the penalty charge. Therefore,

the testimony would not likely have been different if the records were obtained and, as a result, Lorenzana cannot demonstrate prejudice.

{¶ 43} The second assignment of error is overruled.

C. Sufficiency of the Evidence

{¶ 44} In the third assignment of error, Lorenzana argues the trial court erred when it denied his Crim.R. 29(A) motion because the State failed to establish the drug weight required to sustain his convictions.

{¶ 45} We note that "[a] motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 2006-Ohio-2417, ¶ 37, citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995); *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 46} With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.),

citing *Thompkins* at 387. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 47} In *State v. Jones*, 2021-Ohio-3311, the Ohio Supreme Court cautioned:

> But it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id.* at ¶ 16.

{¶ 48} Lorenzana argues that Andrus failed to conduct the type of testing that would establish the alleged weight of the substances because he could not make that inference within a reasonable degree of scientific certainty regarding the 939 untested pills. Lorenzana, relying on a different *Wright* case, *State v. Wright*, 2017-Ohio-9041 (4th Dist.), contends that this concession should have resulted in the exclusion of the untested pills and an acquittal of the charges.

{¶ 49} In *Wright*, the evidence consisted of "a prescription bottle of 98 pills marked 'A214' and a plastic bag containing 95 pills with five different markings: (1) 63 pills marked 'M30'; (2) 21 pills marked 'A215'; (3) 1 pill marked '224'; (4) 7 pills marked 'K8'; (5) 3 pills marked 'A214.'" *Id.* at ¶ 6. The forensic scientist

testified that he tested six pills in total, one pill from each differently marked group. Each of the six pills he tested contained oxycodone. After testing one of each marked group of the 95 pills and finding it contained oxycodone, the forensic scientist testified that it would be reasonable to infer that the remaining pills in the group also contained oxycodone. However, the forensic scientist "did not testify that he personally made this inference or that he made this inference with a reasonable degree of scientific certainty[.]" *Id.* He testified that "his sample population was insufficient for him to draw inferences about the substance of the remaining pills with a reasonable degree of scientific certainty." *Id.* at ¶ 11.

{¶ 50} Wright moved to exclude the pills from evidence based on the forensic scientist's inability to testify about the content of the remaining pills with a reasonable degree of scientific certainty and moved for a dismissal under Crim.R. 29, arguing that the State has not met the prima facie elements of the case. *Id.* at ¶ 14-15. The trial court denied Wright's motions, and the jury found him guilty of all counts — complicity to aggravated trafficking; trafficking, and drug possession. *Id.* at ¶ 15.

{¶ 51} On appeal, the Fourth District stated that the "hypergeometric" or "random sampling method" is an accepted method of testing and found that the remaining, untested pills should have been excluded because the forensic scientist testified that he did not use the hypergeometric or random sampling method and he could not identify the content of the remaining pill population within a reasonable degree of scientific certainty. *Id.* at ¶ 31. The court held, "Because the state's expert

witness could not identify the substance of the remaining pills with a reasonable degree of scientific certainty, the trial court should have excluded them from evidence." *Id.* at ¶ 41.

{¶ 52} We find *Wright* distinguishable. In the instant case, Andrus (the State's expert) testified that he used a different type of random sampling, not the hypergeometric test method, and he could say with complete confidence that the balance of the 939 pills are that same drug after he determined that the one pill he selected was fentanyl. Andrus described his random testing method. It consisted of him removing the 940 pills from the one bag and the 15 pills from the other bag, visually inspecting them and deciding, based on his training and experience, that they were uniform in shape, color, size, and markings and then selecting a random sample for testing. Specifically, he testified that the 940 pills were found in a single plastic bag, were all blue in color, and had a marking of "M30" and the 15 pills were in a separate bag, were all blue in color, and also had a marking of "M30." Andrus determined that the bag of 940 pills and the bag of 15 pills all had similar characteristics but separated them for testing based on the fact that they were located at two different locations and were contained within separate containers. Both the bag of 15 pills and the bag of 940 pills were determined to each be a separate homogenous population. After testing one pill from the 940 pills contained in the first bag, Andrus determined that the pill contained fentanyl. Andrus also tested one pill from the bag of 15, and it contained fentanyl as well. Andrus testified on cross-examination that he could say with complete confidence that the balance of

the 939 pills are that same drug after he determined the one pill he selected was fentanyl. (Tr. 586.)[2]

{¶ 53} In *State v. Martin*, 2007-Ohio-6062 (8th Dist.), this court recognized that the "random sampling method of testing has been consistently upheld by Ohio courts" and held that "evidence of the random sampling method is sufficient as a matter of law to support a determination that the entire substance recovered together and similarly packaged is the same controlled substance as that tested." *Id.* at ¶ 42, citing *In re Lemons*, 77 Ohio App.3d 691 (8th Dist. 1991), *State v. Rose*, 2001-Ohio-3297 (7th Dist.); *State v. Mattox*, 13 Ohio App.3d 52 (2d Dist. 1983); *State v. Smith* 1997 Ohio App. LEXIS 6020 (10th Dist. Dec. 23, 1997); *State v. Smith*, 1990 Ohio App. LEXIS 4359 (8th Dist. Oct. 4, 1990); *see also State v. Mitchell*, 2010-Ohio-520 (where this court upheld the random sampling method as applied to 31 rocks of cocaine). "The 'random sampling method of testing creates a reasonable inference that all similar contraband contains the same controlled substance as that tested, at least when the contraband is recovered together and similarly packaged.'" *Id.*, quoting *State v. Samatar*, 2003-Ohio-1639 (10th Dist.).

{¶ 54} Based the previous holdings of our court, we find that Andrus's testimony regarding the random sampling method he employed is sufficient to

---

[2] While Andrus stated that he would not consume a pill from a population where the only pill tested contained compressed sugar, this does not mean that Andrus contradicted himself as Lorenzana contends. When taken in context of his entire testimony, it is reasonable to infer that Andrus would not consume the untested pills in this hypothetical because his testimony revealed that some of the pills are mislabeled and more often than not, the pills contain a controlled substance.

support his determination that the entire substances recovered together and similarly packaged are the same controlled substance as that tested. As a result, the State met its burden of persuasion regarding the weight of the pills.

{¶ 55} Therefore, the third assignment of error is overruled.

D. Manifest Weight of the Evidence

{¶ 56} In the fourth assignment of error, Lorenzana argues that his convictions are against the manifest weight of the evidence.

{¶ 57} When reviewing a manifest weight challenge, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 2022-Ohio-1397, ¶ 54 (8th Dist.), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387 (1997), quoting *Martin* at 175.

{¶ 58} As this court has previously stated:

The criminal manifest weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id.* Although there may be legally sufficient evidence to

support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 2020-Ohio-269, ¶ 86-87 (8th Dist.).

{¶ 59} Lorenzana contends that the same reasons that support dismissal of his convictions also support a finding that his convictions are against the manifest weight of the evidence. Additionally, he argues the jury lost its way because the female guest was not charged, Officer Butcher did not document by photograph where he found the drugs or how they were found, and there was no body camera footage of the incident. While Lorenzana attacks the quality of this evidence, he does not demonstrate how the jury clearly lost its way and created such a manifest miscarriage of justice.

{¶ 60} The fact that the female guest was not charged has no bearing on whether the jury clearly lost their way. In addition, the fact a picture of the drugs in the toilet tank was lacking does not equate to the jury losing its way because Officer Butcher testified that he discovered the bag of drugs in the toilet tank and took them out before taking a picture of them. Furthermore, the fact that there were no body cameras worn on the day of the incident does not demonstrate that the jury clearly lost its way because the officers testified that they found drugs on Lorenzana's person and in the toilet tank, $987 in cash, two cell phones, Ziploc bags, and

separate baggies of pills. Thus, when all the evidence is weighed, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that Lorenzana's convictions must be reversed and a new trial ordered.

{¶ 61} Therefore, the fourth assignment of error is overruled.

E. Speedy Trial

{¶ 62} In his fifth assignment of error, Lorenzana argues that he did not receive a speedy trial under R.C. 2475.71 and that his rights to a speedy trial under the Ohio and United States Constitutions were violated.

{¶ 63} The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant a speedy trial by the State. *State v. Ladd*, 56 Ohio St.2d 197, 200 (1978). Additionally, Ohio Const. art. I, § 10 provides that all criminal defendants have a right to a speedy trial. The constitutions do not specify any timeline required to ensure the protection of this right.

1. Plain Error

{¶ 64} Initially, we note that Lorenzana failed to raise any speedy trial issue at the trial court. In failing to do so, Lorenzana has waived his right to raise a statutory speedy trial violation on appeal. *State v. King*, 2009-Ohio-4551, ¶ 10 (8th Dist.), citing *State v. Ennist*, 2008-Ohio-5100 (8th Dist.).[3] "That being said, the Ohio Supreme Court has held that a defendant who enters a guilty plea does not waive her constitutional right to a speedy trial." *Id.*, citing *State v. Branch*, 9 Ohio

---

[3] In *King*, the defendant pled guilty at the trial court and then raised a speedy trial issue for the first time on appeal. While *King* was decided under the context of a guilty plea, we still find its speedy trial analysis applicable to the instant case.

App.3d 160, 162 (8th Dist. 1983), citing *State v. Pachay*, 64 Ohio St.2d 218 (1980). Therefore, we will review for plain error whether Lorenzana's constitutional rights to a speedy trial were violated. *Id.* at ¶ 10.

{¶ 65} Plain error is an obvious error or defect in the trial court proceedings that affects a defendant's substantial right and the outcome of the trial. Crim.R. 52(B); *State v. Rogers*, 2015-Ohio-2459, ¶ 22. The Ohio Supreme Court, however, has admonished appellate courts to "notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

2. Constitutional Rights

{¶ 66} The United State Supreme Court set forth the test for a violation of a defendant's constitutional right to a speedy trial in *Barker v. Wingo*, 407 U.S. 514 (1972). The *Barker* Court held that the test includes considering (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of their right to a speedy trial; and (4) the prejudice to the defendant. *Id.* at 530-32; *see also State v. Triplett*, 78 Ohio St.3d 566, 568 (1997). The length of the delay is the "triggering mechanism" that determines the necessity of inquiry into the other factors. *Barker* at 530. Until there is some delay that is presumptively prejudicial, "there is no necessity for inquiry into the other factors that go into the balance." *Id.*

{¶ 67} With regard to Lorenzana's constitutional speedy trial rights, he contends that his were violated when approximately 635 days elapsed before he was brought to trial, which he maintains was the result of undue delay.

a. Length of Delay

{¶ 68} The length of delay is a "triggering mechanism" that determines the necessity of inquiry into the other factors. *Id.* at 530. In *Doggett v. United States*, 505 U.S. 647, 652 (1992), the United States Supreme Court has noted that this factor involves a dual inquiry. First, a threshold determination is made as to whether the delay was "presumptively prejudicial," triggering the *Barker* inquiry. Second, the length of the delay is again considered and balanced against the other factors. *Brook Park v. Ruzicka*, 2008-Ohio-44, ¶ 24 (8th Dist.), citing *State v. Smith*, 2003-Ohio-3524 (8th Dist.). One year is generally considered enough to trigger a review. *Triplett* at 568, citing *Doggett* at 652.

{¶ 69} In this case, Lorenzana was arrested on August 5, 2021, and indicted on September 8, 2021. He was released on bond on September 11, 2021. A review of the docket reveals that several pretrials were continued at Lorenzana's request and due to the COVID outbreak. Lorenzana failed to appear for a pretrial on November 4, 2021, a capias was issued, and he was taken into custody on January 22, 2022. Then several pretrial were continued at Lorenzana's request until March 7, 2022. On March 14, 2022, Lorenzana's initial defense counsel filed a motion to suppress, and the March 2022 trial date was continued by a joint request of the parties. On March 30, 2022, Lorenzana's subsequent defense counsel filed a

notice of appearance. Defense counsel then filed a demand for discovery in April 2022. The State responded to this discovery demand and sent a reciprocal demand for discovery. Lorenzana never responded to this demand, and second defense counsel's representation ended in October 2022.

{¶ 70} Lorenzana was then re-released on bond. A subsequent trial date was set for November 2022. This date was continued based on the lack of representation because Lorenzana was in the process of retaining new counsel. Lorenzana continued to request continuances for all pretrials from November 2022-December 2022, and on December 6, 2022, a capias was issued. Lorenzana was taken into custody on December 7, 2022. Lorenzana requested continuances to obtain new counsel from December 2022 until January 2023.

{¶ 71} Lorenzana was assigned a third defense attorney on January 3, 2023. Again all pretrials and trials from January 2023-April 2023 were continued at Lorenzana's request. Trial was set for April 5, 2023, but was continued because the trial court was unavailable due to being engaged in another matter. The trial was rescheduled for April 11, 2023, but was continued at Lorenzana's request because defense counsel was engaged in an unrelated matter. The court held the suppression hearing on May 1, 2023, and trial began on May 2, 2023.

{¶ 72} While the 21-month delay is significant, we find that it did not infringe on Lorenzana's liberty. The interests that the Sixth Amendment was designed to protect — freedom from extended pretrial incarceration and from the disruption caused by unresolved charges — were not at issue since the foregoing demonstrates

that Lorenzana contributed to the majority of the delay. Therefore, while the first factor does technically weigh in Lorenzana's favor, its weight is negligible.

b. Reasons for Delay

{¶ 73} When determining if the reason for the delay should weigh in favor of the accused or the State, this factor should weigh heavily against the accused if the accused caused or contributed to the delay. *State v. Smith*, 2003-Ohio-3524, ¶ 14 (8th Dist.); *State v. Robinson*, 2017-Ohio-6895 (8th Dist.) As discussed above, the record demonstrates that Lorenzana contributed to the delay. Thus, this factor weighs in favor of the State.

c. Assertion of Right to a Speedy Trial

{¶ 74} An accused's assertion of, or failure to assert, their right to a speedy trial is a factor to be considered in determining whether their constitutional rights were violated. *Barker*, 407 U.S. at 528; *Triplett*, 78 Ohio St.3d at 570. Here, Lorenzana failed to timely assert his speedy trial right. We therefore weigh this factor in favor of the State.

d. Prejudice to the Defendant

{¶ 75} In *Barker*, the United States Supreme Court identified three interests that the speedy-trial right is designed to protect: (1) oppressive pretrial incarceration; (2) the anxiety and concern of the accused; and (3) the possibility that the accused's defense will be impaired. *Id*. at 532. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id*.

{¶ 76} Lorenzana has failed to establish that he was prejudiced by the delay. He only asserts that there was undue delay, he does not assert any of the above-factors. And, most importantly, he does not assert that this delay prevented him from mounting a defense. The absence of prejudice weighs heavily against Lorenzana.

{¶ 77} Based on the foregoing, we find that the *Barker* factors weigh more heavily in favor of the State. Therefore, Lorenzana cannot demonstrate plain error and the fifth assignment of error is overruled.

F. Sentence

{¶ 78} In the sixth assignment of error, Lorenzana challenges the consecutive nature of his sentence; the imposition of indefinite time; the lack of allocution; and the mandatory fine.

1. Standard of Review

{¶ 79} Under R.C. 2953.08(G)(2), an appellate court may increase, reduce or otherwise modify a sentence or vacate a sentence and remand for resentencing if it "clearly and convincingly" finds that (1) the record does not support the sentencing court's findings or (2) the sentence is "otherwise contrary to law." *State v. Marcum*, 2016-Ohio-1002, ¶ 21.[4]

---

[4] We note that in *State v. Gwynne*, 2023-Ohio-3851 ("*Gwynne V*"), the Supreme Court of Ohio reconsidered and vacated its decision in *State v. Gwynne*, 2022-Ohio-4607 ("*Gwynne IV*"). Therefore, we follow the pre-*Gwynne IV* deferential standard of review applied to appellate review of consecutive-sentence findings. *See State v. Neal*, 2023-Ohio-4414, ¶ 7, fn. 1 (8th Dist.), citing *State v. Scott*, 2022-Ohio-1486, ¶ 9 (8th Dist.) (recognizing the deferential nature of the appellate standard of review for consecutive-

2. Consecutive Sentence and Imposition of Indefinite Time

{¶ 80} R.C. 2929.14(C)(4) provides that in order to impose consecutive sentences, the court must find that "the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." The court also must make at least one of the findings set forth under R.C. 2929.14(C)(4)(a)-(c).

{¶ 81} We note that "[w]hen imposing consecutive sentences, a trial court must state the required findings as part of the sentencing hearing" and "incorporate its statutory findings into the sentencing entry." *State v. Bonnell*, 2014-Ohio-3177, ¶ 29. The trial court is not required to recite verbatim the statutory language; however, we must be able to glean from the record that all of the findings required by R.C. 2929.14(C) were made by the trial court. *Id.* at ¶ 36-37.

{¶ 82} Here, the trial court sentenced Lorenzana to the mandatory minimum of 11 years on Count 1. The court then informed Lorenzana that the indefinite sentence could range up to 16 and half years under Reagan Tokes. Lorenzana received a total concurrent sentence of one year on Counts 3-5, and the court ran these counts consecutively to Count 1 for a total of 12 years to 17.5 years in prison.

---

sentence findings), citing *State v. Venes*, 2013-Ohio-1891, ¶ 21 (8th Dist.). We further note that in *State v. Hayes*, 2023-Ohio-4119 (8th Dist.), this court applied the *Gwynne IV* de novo standard of review to consecutive-sentence findings, and in *State v. Stiver*, 2024-Ohio-65, ¶ 20 (8th Dist.), "we expressly refuse[d] to follow *Hayes*."

{¶ 83} Lorenzana contends that the court did not make the required finding that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public and the findings that it did make were not supported in the record. We disagree.

{¶ 84} A review of the record reveals that the trial court stated that it had considered all factors prior to imposing sentence and that

> these multiple offenses were committed as part of, or a course of conduct, and the harm caused by two or more of the multiple offenses so committed were so great or unusual that no single prison term for any of these offenses committed as part of the course of conduct would adequately reflect the seriousness of [Lorenzana's] conduct.

(Tr. 673-674.) The court then acknowledged his pending arrests warrants and found that Lorenzana's history demonstrates that consecutive sentences are necessary to protect the public from future crimes. Therefore, we find that the trial court made the required findings and properly imposed consecutive sentences.

{¶ 85} With regard Reagan Tokes, Lorenzana argues the trial court did not adequately provide the mandated notifications set forth in R.C. 2929.19(B)(2)(c)(i)-(v), which requires the trial court to inform an offender at the sentencing hearing certain notifications about the offender's indefinite sentence. These notifications involve the rebuttable presumption regarding the offender's release from service of the sentence; how the department of rehabilitation and correction may rebut that presumption; and the mandatory release of an offender following the expiration of the maximum prison term imposed.

{¶ 86} A review of the record however, reveals that the trial court did in fact inform Lorenzana about his indefinite sentence at the time of sentencing. The court stated:

> Under Reagan Tokes, that will be the mandatory minimum definite sentence. The maximum indefinite sentence will be 16 and a half years.
>
> Mr. Lorenzana, the way that works is you will be released upon the completion of your 11-year sentence, unless the Ohio Department of [Rehabilitation] and [Correction] determines that you should remain in prison for what they consider to be bad conduct or bad time.
>
> If that happens, they'll flop you back. They'll give you a new release date and you'll be released upon the completion of your new release date unless, once again, you are found to have committed more bad conduct, in which case they'll flop you back and give you a new release date.
>
> That process could happen over and over again until you reach your maximum indefinite sentence of 16 and a half years.

(Tr. 672-673.)

3. Allocution

{¶ 87} Lorenzana contends that neither party addressed the court and he was not given a chance to make any statement regarding sentencing before it was imposed in violation of Crim.R. 32, which affords counsel an opportunity to speak, at the time of sentencing, on behalf of the defendant and address the defendant personally and ask if the defendant wishes to make a statement or present any information in mitigation of punishment.

{¶ 88} Contrary to Lorenzana's assertion, a review of the transcript reveals that the parties did address the court. Defense counsel was heard and put forth mitigation. Additionally, the trial court asked if Lorenzana wanted to be heard, but

he made no statement after it was determined that he was going to appeal. Therefore, Lorenzana's right to allocution was not violated.

4. Waiver of Mandatory Fine

{¶ 89} In the instant case, the sentencing journal entry imposed a mandatory $10,000.00 fine, but states that "Defendant declared indigent. Fine(s) waived." A review of the sentencing transcript is clear that the court intended to waive the mandatory fine. The court stated: "I will find that you are indigent and waive that mandatory fine. I will — however, I will order to you pay court costs." (Tr. 675.) Because the court speaks through its journal entry and this entry does not reflect the truth, we must remand the matter to the trial court to correctly reflect that mandatory the $10,000 fine was waived.

{¶ 90} Therefore, the sixth assignment of error is overruled in part and sustained in part.

{¶ 91} Accordingly, judgment is affirmed, and the case is remanded for the trial court to correct the journal entry to reflect that the mandatory $10,000 fine was waived.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

MICHELLE J. SHEEHAN, P.J., and
ANITA LASTER MAYS, J., CONCUR